ST. PAUL, M. & M. RY. CO. v. WESTERN UNION TEL. CO. et al.

(Circuit Court of Appeals, Eighth Circuit.    November 3, 1902.)

No. 1,571.

1. TELEGRAPHS—CONTRACTS BETWEEN RAILROAD AND TELEGRAPH COMPANIES—
CONSTRUCTION.

A railroad company, having 80 miles of its road under construction, with extensions projected, entered into a contract with certain persons by which the latter agreed to construct, maintain, and operate a telegraph line along the right of way for said 80 miles on stated terms and conditions, relating to the cost of construction and maintenance, its renewal, and its operation for the benefit of both parties. The contract contained no limitation as to time, and provided that as the railroad was extended the other parties should continue the line of telegraph along the line of road upon the same terms and conditions. It contained a further provision that the railroad company "does hereby grant to the said parties of the first part, for the uses and purposes of this contract, and to keep off competing lines, the exclusive right of way for the lines of the telegraph along and upon the lands of the party of the second part, as far as can be legally done; and it is hereby mutually agreed that this contract shall be binding upon the successors, representatives, and assigns of both parties hereto." Held, that such contract did not operate as a present grant of an estate or interest in the railroad right of way, to be held and enjoyed by the grantees for all time, independently of the provisions of the agreement, and which could be extinguished only by a reconveyance, but that the grant was intended to continue only so long as the contract, "for the uses and purposes" of which it was made, should continue in force, and that it was within the power of the parties or their successors to terminate the same by subsequent parol agreements.

2. SAME—GRANT OF EASEMENT.

In no event could such contract be construed to grant a present and vested right, in the nature of an easement, in any right of way which had not at the time been acquired or located by the railroad company; but it could, at most, create a mere equitable right to have the grant perfected when the property to which it related had been acquired, and until so perfected it could be relinquished by parol, or by acts in pais which clearly evidenced such an intention.

3. SAME—MODIFICATION BY NEW CONTRACT.

The individuals with whom the contract was made assigned the same to the Northwestern Telegraph Company, which, under such contract, and a subsequent agreement made with the receiver appointed for the property of the railroad company in foreclosure proceedings, built and operated several hundred miles of telegraph lines prior to the sale of the railroad in the foreclosure suit, at which complainant became the purchaser. Thereafter complainant and the Northwestern Company entered into a new contract, which was wholly executory in character, containing no reference to any prior agreement, or to rights previously acquired by either party. It bound the telegraph company to construct a line of telegraph along and upon the right of way of any railroad, then constructed or thereafter constructed, owned, leased, or operated by complainant. and, while it contained no limit as to duration, gave either party a right to a modification of its terms on an equitable basis after the expiration of 10 years, and at intervals of 5 years thereafter. Held, that such contract superseded all prior agreements between the predecessors in interest of the parties, and also placed all lines of telegraph theretofore constructed on a plane of equality, so far as the rights of the parties therein were concerned.

4. SAME—ASSIGNMENT OF CONTRACTS—MERGER OF TELEGRAPH COMPANIES.

After the execution of such contract the Northwestern Company transferred all its contracts and property to the Western Union Tele-

118 F.—32

graph Company, under an agreement that it would not engage in the business of telegraphy, nor build, own or lease any lines of telegraph, for the term of 99 years, in consideration of which the Western Union Company agreed to pay the interest on its bonds, and a certain sum yearly to its stockholders as dividends, and to restore the property at the end of such term. No limitation was placed on its power to deal with the contracts assigned. *Held,* that in view of the long term during which the charter powers of the Northwestern Company were devolved on the Western Union Company, which amounted practically to its merger in such company, the latter had implied power to deal with all such contracts as it deemed best, and to either modify the same, or substitute others in their stead.

5. SAME — CONTRACTS BETWEEN RAILROAD AND TELEGRAPH COMPANIES — RIGHTS OF PARTIES.

Negotiations between complainant and the Western Union Company resulted in a contract between them which recited that they jointly owned the existing telegraph lines along complainant's road, then being operated under the contract between complainant and the Northwestern Company, which contract had been transferred to the Western Union Company; that complainant had extended its road, and desired telegraph lines constructed on such extensions; and that both parties desired and requested the modification and cancellation of such prior contract. It provided that it should supersede such prior contract, and all other agreements between the parties or their respective predecessors; that it should continue in force for 10 years, and during such time should extend to all roads then or thereafter owned or controlled by complainant. It further provided that the telegraph company should furnish all the material, labor, and tools necessary for the construction of new lines, and all the materials and tools necessary for the maintenance, repair, and reconstruction of existing lines, and for the reconstruction of lines along all extensions and leased and controlled railroads, and the labor for the stretching of additional wires upon existing lines; the railroad company agreeing to furnish free transportation over its lines to employés of the telegraph company when engaged in the performance of their duties and the labor for the maintenance, repair, and reconstruction, when necessary, of all existing telegraphic lines. The telegraph company was to furnish such telegraph service as required for the business of the railroad. At the time such contract was made, lines had been constructed along 853 miles of complainant's railroad, and, during the 10 years it was in force, extensions were made, both of railroad and telegraph lines, amounting to nearly 4,000 miles additional. *Held,* that under such contract the parties were equal joint owners of the 853 miles, to the cost of which they or their predecessors had contributed about equally, the recital of such joint ownership in the contract itself being binding on all parties in interest; that the telegraph company was the owner of the new lines constructed under such contract at its own cost, subject to a reasonable allowance to complainant for its services in distributing the materials; that on the termination of the contract the telegraph lines did not become the property of complainant, because attached to its right of way, nor did the telegraph company have a perpetual easement which entitled it to maintain its lines thereafter on such right of way without the payment of compensation, but that the interests of the respective parties were unaffected and unimpaired by such termination, the only effect of which was to require a readjustment of the terms and conditions on which the lines should be thereafter maintained and operated.

6. SAME—RIGHTS ON TERMINATION OF CONTRACT.

Where a telegraph company, vested with the power of eminent domain, constructed its lines upon the right of way of a railroad, with the consent of the owner, in such a manner that they did not interfere with the operation of the road, under an agreement that the lines of telegraph should form a part of its telegraphic system, which agreement further provided that it should remain in force for 10 years, but contained no

express provision requiring the telegraph company, at the expiration of 10 years, to remove its lines from the right of way, *held*, that it was competent for a court of equity, whose jurisdiction had been invoked by the railroad company to restrain the telegraph company, on the termination of the contract, from using the lines on the theory that they had become the property of the railroad company, to determine the amount of reasonable compensation which should be paid by the telegraph company for its continued use of the right of way, and to permit it to maintain and operate its lines thereon on payment of such compensation.

7. SAME.

The contract between complainant and the Western Union Company provided for the maintenance, operation, and extension of telegraph lines admitted therein to be the joint property of the contracting parties; and having stipulated the proportion of the cost and expense to be borne by each party, and the use to be made of the lines for the benefit of each, without making any distinction in either respect between the lines existing and those to be built, no inference can be drawn of an intention that the ownership of the new lines should be different from the old, or that either party should pay the other for services rendered in their construction, and, in the absence of express provision otherwise, the extensions became also the joint property of the parties. Per Sanborn, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the District of Minnesota.

For opinion below, see 106 Fed. 243.

This is a controversy between the St. Paul, Minneapolis & Manitoba Railway Company, the appellant, and the Western Union Telegraph Company and the Northwestern Telegraph Company, the appellees, concerning their respective rights and interests in lines of telegraph erected and now standing on the right of-way of said railway company in the states of Minnesota, North Dakota, Montana, Idaho, Oregon, and Washington. For brevity, the appellant will be styled the Manitoba Company, while the appellees will be referred to, respectively, as the Western Union Company and the Northwestern Company.

The facts out of which the controversy arises are substantially these:

On September 21, 1863, the St. Paul & Pacific Railroad Company, which had succeeded to all the rights, privileges, franchises, and property of the Minnesota & Pacific Railroad Company, a land-grant company, was engaged in constructing a line of railroad from Stillwater, in the state of Minnesota, by way of St. Paul and St. Anthony, via Minneapolis, to Breckenridge, on the western border of the state, with a branch road, via Anoka, St. Cloud, and Crow Wing, to St. Vincent, in the northwestern portion of the state. Little, if any, of the road had at that time been built, but work was in progress on that part of the line between St. Paul and Watab, which latter place was near St. Cloud, on the projected branch line to St. Vincent, and was about 80 miles distant from St. Paul. At the date last aforesaid (September 21, 1863) the St. Paul & Pacific Railroad Company entered into a contract with A. B. Smith and Z. G. Simmons for the building of a line of telegraph on the railroad right of way from St. Paul to Watab. Omitting unimportant retails, this contract provided that Smith & Simmons, for the sum of $90 per mile to be paid by the railroad company, should build and keep in good repair a line of telegraph along the line of said railroad from St. Paul to Watab; that the employés of the railroad company should watch the line and mend it when they could, and that the railroad company should furnish convenient facilities to the telegraph company for repairing breaks in the line when it could do so without unnecessary expense; that Smith & Simmons should furnish all materials for repairing the line, and should renew the line, when necessary, at their own expense; that the railroad company should furnish rooms in its depots for telegraph offices free of charge; that Smith & Simmons should send messages of the railroad com-

pany relating to railroad business, free of charge, over all their lines of telegraph in the state of Minnesota; that they should be entitled to all money received on account of commercial and public business passing over the line, which was to be accounted for and paid over monthly; that the telegraph business of the railroad company should have the preference over commercial business; that, in case one wire proved insufficient to transact the business without delay, Smith & Simmons might string additional wires at their own expense; and that, if the railroad company wanted greater facilities, it might require Smith & Simmons to string additional wires, but in that event the expense should be borne by the railroad company.

The seventh and eleventh paragraphs of this contract, over which much controversy has arisen, are as follows:

"Seventh. And the said party of the second part does hereby grant to the said parties of the first part, for the uses and purposes of this contract, and to keep off competing lines, the exclusive right of way for the lines of the telegraph along and upon the lands of the said party of the second part, as far as can be legally done. And it is hereby mutually agreed that this contract shall be binding upon the successors, representatives, and assigns of both parties hereto."

"Eleventh. It is further agreed that, as the said Saint Paul and Pacific Railroad Company shall further construct and operate their said road, the parties of the first part may and shall continue the same line of telegraph along the line of said road upon the same terms and conditions as hereinbefore mentioned. Each agree to conform to all the requirements above mentioned."

On February 5, 1866, the St. Paul & Pacific Railroad Company, by legislative action, became segregated into two corporations, one of which was termed the First Division of the St. Paul & Pacific Railroad Company, and under that name succeeded to all the corporate rights, powers, and franchises of the St. Paul & Pacific Railroad Company, as respects the road which the latter company had been authorized to construct from St. Paul northwestwardly to Watab, and from St. Anthony westwardly across the state to Breckenridge, or, more accurately, to a point between the foot of the Big Stone Lake and the mouth of the Sioux Wood river. After the St. Paul & Pacific Railroad Company became subdivided into two corporations, mortgages were executed by the respective companies covering the line of road which became the property of the First Division Company from St. Paul to Watab and from St. Anthony to Breckenridge; also covering the branch line from St. Cloud to St. Vincent, which remained the property of the parent company. These mortgages were foreclosed by actions instituted in the state and federal courts for the state of Minnesota; the result being that in May, 1879, the appellant, the Manitoba Company, bought at foreclosure sale under a decree of the state court the line of road from St. Paul to Watab; and in June, 1879, at a like sale under a decree of the state court, the line from St. Anthony to Breckenridge; and in June, 1879, at a like sale under a decree of the federal court, the line of road, then partially unbuilt, between St. Cloud and St. Vincent. While this latter road was in the custody of a receiver appointed by the federal court in the foreclosure suit, the receiver, J. P. Farley, on April 16, 1878, entered into a contract with the Northwestern Company, one of the appellees, relative to the construction of telegraph lines along the roads in his custody. Long prior to the execution of this latter contract, to wit, on January 17, 1865, the Smith & Simmons contract with the St. Paul & Pacific Railroad Company had been assigned to the appellee the Northwestern Company by persons who assumed to be the owners thereof, viz., by Z. G. Simmons, one of the original contracting parties, and by O. S. Wood, acting "by E. Cobb, His Atty.," and by Emory Cobb. In what manner, if any, O. S. Wood and Emory Cobb acquired an interest in the Smith & Simmons contract, and in what manner E. Cobb acquired authority from O. S. Wood to assign his interest, is not disclosed by the record.

By the Farley contract it was provided, in substance, that the telegraph company should construct on the right of way of any railroad then or thereafter constructed, owned, leased, or operated by the St. Paul & Pacific

Railroad Company a telegraph line of one or more wires, as might be required, on poles of a certain size; that both contracting parties might establish telegraph stations at all points on the roads covered by the contract, the operators whereat should form a part of the telegraph corps, and be subject to the rules of the telegraph company; that reports should be made monthly of all commercial business transacted at the various stations, the proceeds of which should be paid to the telegraph company; that the railroad company should pay to the telegraph company one-half the cost of constructing said telegraph line; that the telegraph company should furnish all the materials necessary to repair and maintain the lines, and that the railroad company should do all the work necessary to keep them in good working order; that, wherever two wires were strung, each contracting party should have the exclusive right to the use of one wire; that either party might, at its own expense and for its exclusive use, have the right to place one or two additional wires upon the poles constituting the line; that when only one wire was strung the use thereof should be joint and mutual, but that important railroad business should have the preference. In addition to these provisions, the Farley contract contained the following stipulations, to which much importance is attached by counsel: That is to say, the receiver covenanted for and in behalf of the St. Paul & Pacific Railroad Company that the telegraph company should have the right of way on and along the railroads of the railroad company for the construction and use of telegraph lines for commercial or public uses and business, and that it would not transport men or material for the construction of a telegraph line in opposition to the Northwestern Company, except at the usual rate charged other persons, or distribute material for such opposing line, except at regular stations; that the provisions of the contract should extend to all railroads owned or controlled by the railroad company, or which might be owned, operated, leased, or controlled by it; and that at periods of 10 years either party, on giving 30 days' notice, might call for a reconsideration and readjustment of the terms of the contract on an equitable basis, so as to secure to both parties the largest benefit.

While there is some controversy over the fact, and the proof is not clear, yet the evidence justifies the conclusion that a line of telegraph was built under the provisions of the Smith & Simmons contract from St. Paul to St. Cloud, a place near Watab, and from St. Anthony to Breckenridge; that such telegraph line was erected between St. Anthony and Breckenridge contemporaneously with the construction of the railroad between those points by the First Division Company; and that, as respects the branch road from St. Cloud to St. Vincent, a telegraph line was constructed either under the Smith & Simmons contract or under the Farley contract. A line of telegraph along such parts of the branch road as had not been built and put in operation when the Farley contract was executed was doubtless constructed under the provisions of the latter contract.

Shortly after the acquisition of the several roads as aforesaid by the Manitoba Company at the foreclosure sales, it entered into negotiations with the Northwestern Company for a new telegraph contract, embracing all the roads then owned by it, which resulted in the execution of a new agreement between said companies on October 15, 1879, which will be referred to hereafter as "Contract A." By contract A it was agreed that the telegraph company should construct upon the right of way of any railroad then or thereafter constructed, owned, leased, or operated by the railroad company, as fast as the road was built, a line of telegraph, with one or more wires, as might be required; that the telegraph company should furnish all the materials necessary to repair and maintain the lines, and that the railroad company should do all the work necessary to keep them in good working order; that the telegraph company should furnish the railroad company telegraphic service over any of its lines, wherever situated, to the value of $2,000 per annum; that the railroad company should pay to the telegraph company one-half the cost of constructing the line; and that at the expiration of 10 years, and at the end of each 5-year period thereafter, either party, upon 30 days' notice, might call for an equitable readjustment of their rights under the contract. Both the Farley contract and contract A

contained a provision that the telegraph lines referred to therein should form a part of the general sytem of the telegraph company, and that, as respects commercial and public business, they should be regulated and controlled by it. In all other respects the two contracts, save as to the parties, were substantially alike, but no reference was made in contract A to any prior contract.

On May 7, 1881, the Northwestern Company was practically absorbed by the Western Union Company, and shortly thereafter the Northwestern Company ceased to transact a telegraph business. All of its lines and property of every description were transferred to, and passed into the custody and control of, the Western Union Company. All of its telegraph contracts, including contract A, were assigned to the Western Union Company. Of the agreement between the two telegraph companies by virtue of which the merger took place, it will suffice to say at present that the Northwestern Company covenanted that during the period of 99 years covered by the agreement it would "not * * * engage in the business of telegraphy, nor build nor own any lines of telegraph, or hold the same by lease or otherwise"; that, in exchange for what it acquired under the agreement, the Western Union Company engaged to pay the interest on outstanding bonds of the Northwestern Company to the amount of $1,180,000, or on other bonds that might be issued in exchange therefor; also to pay $100,000 per year, with a pro rata increase of that sum each year until July 1, 1896, when the sum then and thereafter to be paid annually during the life of the agreement should be $150,000; that it would also pay $2,500 yearly for 14 years, to cover the expense of keeping up the corporate organization of the Northwestern Company. The annual payments aforesaid of $150,000 per year, by the terms of the agreement, were to be made directly to the stockholders of the Northwestern Company, as a dividend on their stock, the total amount of which was guarantied to be $2,500,000. The Northwestern Company reserved to itself the right to terminate the agreement in case the Western Union Company failed to make the aforesaid payments for as much as three months after they severally became due. The agreement also contained a provision binding the Western Union Company to restore the property which it had acquired thereunder to the Northwestern Company in as good condition as when received, at the expiration of 99 years.

On August 23, 1882, a new telegraphic agreement was executed by and between the Manitoba Company and the Western Union Company, which will be referred to hereafter as "Contract B." This latter contract was the result of a controversy which appears to have arisen between the contracting parties subsequent to the merger of the business of the two telegraph companies under the agreement of May 7, 1881. The Manitoba Company, as it seems, claimed that the assignment of contract A by the Northwestern Company to the Western Union Company terminated that contract, so far as the Manitoba Company was concerned; also that contract A was ultra vires the Manitoba Company, because it had the right under its charter to operate a telegraph as well as a railroad, which telegraphic franchise it had attempted to transfer indefinitely to the Northwestern Company by contract A. The Manitoba Company, in the course of the controversy, doubtless expressed a desire, in some of the interviews, to own and operate telegraph lines of its own on its right of way. The controversy, whatever it may have been, ended, however, with the execution of contract B. This contract began with a recital that the parties thereto, to wit, the Manitoba Company and the Western Union Company, "jointly own certain lines of telegraph along various railroads of the railway company, being the existing lines of telegraph now in operation along the railway company's lines of railroad, * * * now operated under the provisions of a contract dated October 15, 1879," the same being contract A; that this latter contract had been duly transferred by the Northwestern Company to the Western Union Company; that the railway company had extended its road, upon which extensions it desired telegraph lines to be erected, and that both parties desired and requested "the modification and cancellation" of contract A. It is unnecessary to state the provisions of contract B, following the aforesaid recitals, except in so far as they differ from the provisions of contract A, heretofore

stated.  The telegraph company agreed to furnish at its own expense all the materials and tools necessary for the maintenance, repair, and reconstruction, when necessary, of existing lines of telegraph along the railway company's road, and for the construction, maintenance, repair, and reconstruction of such additional wires or lines of poles and wires along said railroads, and along all branches, extensions, leased and controlled lines thereof as the telegraph company might require for its own business, and as might be required for the railroad business of the railway company. The railway company, on the other hand, agreed to furnish at its own expense the necessary labor for the maintenance, repair, and reconstruction of existing lines of poles and wires, as well as for the maintenance, repair, and reconstruction of such additional wires or lines of poles and wires as might be required either on existing roads of the railway company, or on branches and extensions thereof; also on roads that it might lease or control, where there was no telegraph.  The telegraph company agreed to furnish at its own expense the labor for the construction of new lines of telegraph on extensions and branches of the railway company's road, as well as on roads leased and controlled by it on which there was no telegraph line; also to furnish at its own expense the labor for stretching additional wires upon existing lines of poles, and upon extensions and branches of the railway company's road, and to furnish and pay the wages of a foreman to take charge of the work of reconstruction, and to direct the laborers that were hired by the railway company.  The telegraph company agreed to furnish the railway company, free of charge, and for its exclusive use, enough wires on all of its roads to transact the railway business; but it was provided that only one of such exclusive wires should be called for at one time, and that an exclusive wire should be demanded only when it was actually necessary to accommodate the railroad business.  The telegraph company agreed to transmit for the railway company, without charge, over all of its lines of telegraph in the United States, messages, originating at or destined to points on its telegraph lines, and relating strictly to railroad business, the value of which service should aggregate $750 per month, when the railroad company had 1,000 miles of road in operation, and to increase this allowance of free telegraphic service $6 per annum for each additional mile of railroad that might be constructed by the railway company.  By the twelfth paragraph of contract B it was declared that it should "supersede said contract hereinbefore mentioned [meaning contract A], and all other agreements between the parties hereto, or their respective predecessors, and shall extend to all roads now or hereafter owned or controlled by the railway company while this contract remains in force, and to all branches and extensions thereof, * * * where the telegraph company * * * may not be prohibited * * * from constructing lines of telegraph."  It was further provided (and to this clause important consequences are attached by counsel) that the contract should take effect July 1, 1882, and continue in force 10 years, unless sooner terminated by mutual consent.

After the execution of contract B, the parties hereto acted under it continuously for 10 years, and during that period the Manitoba Company extended its railroad from a point in North Dakota to the Pacific Ocean.  As the railroad was extended, a new line of telegraph was constructed by the telegraph company on the railroad right of way pursuant to the provisions of contract B; the result being that by October, 1891, telegraph poles had been erected on over 2,000 miles of the railroad's right of way, and over 6,400 miles of new wire had been strung, at a cost to the telegraph company exceeding $300,000.  In addition to erecting the new lines of telegraph, the telegraph company also discharged its obligation under contract B to repair, maintain, and reconstruct existing lines, which at the date of that contract embraced 853 miles of poles, and 1,537 miles of wire.  Altogether since the execution of contract B the Manitoba Company has constructed about 2,770 miles of railroad, and the Great Northern Railroad Company, its lessee, has constructed over 1,000 miles of railroad along which lines of telegraph have been erected.

Shortly prior to the expiration of contract B, the Manitoba Company preferred a claim that when that contract expired all the lines of telegraph

standing on its right of way, and erected in the manner and under the circumstances aforesaid, would become its exclusive property, by virtue of the provisions of contract B. This claim was controverted by the Western Union Company, and gave rise to the present action. The Manitoba Company, as complainant, exhibited its bill against the Western Union Company on January 16, 1893, in the circuit court of the United States for the district of Minnesota, alleging many of the facts heretofore recited, and praying that it be decreed to be the owner of the telegraph lines in controversy; that the Western Union Company had no interest therein, save such interest as it might have as a joint owner; that it be decreed that contract A was annulled by contract B; and that the Western Union Company might be enjoined from asserting any claim to the line. Subsequently the bill was amended by making the Northwestern Company a party defendant, and thereupon both of the defendants answered, and filed cross-bills, in which many of the facts heretofore stated were recited at length. It will suffice to say generally that by their answers the defendants asserted that they were the owners of the telegraph lines in controversy; the Northwestern Company claiming them as lessor, and the Western Union Company as its lessee. They also asserted the right to maintain and operate the lines of telegraph perpetually on the railroad right of way. By their cross-bills, however, they prayed that the court would fix the compensation to be paid for maintaining the lines on the railroad right of way, provided it found, as respects any part of the right of way, that they were not entitled to further occupy it without paying for its use.

The case reached a final decree in the circuit court at the January term, 1901, which was favorable to the telegraph company. From that decree the Manitoba Company prosecuted an appeal to this court.

M. D. Grover and George B. Young, for appellant.

Rush Taggart and John F. Dillon (C. M. Ferguson and George H. Fearons, on the brief), for Western Union Tel. Co.

George C. Ripley (Burt F. Lum, on the brief), for Northwestern Tel. Co.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The circuit court decided, in substance, that the seventh and eleventh paragraphs of the Smith & Simmons contract, quoted above in the statement, when considered together, granted to Smith & Simmons "a perpetual easement or right to establish, construct, and continue in the operation of a line of telegraph along the line [of railroad] specified in the contract [to wit, from St. Paul to Watab, Minn.], and along such further lines of railroad as should be constructed by the St. Paul & Pacific Railroad Company, and that it became a vested property right" from the date of that contract or grant, which could not be extinguished save by a reconveyance; that the grant of the easement aforesaid was "a then present and vested grant, covering not only the line particularly described" in the Smith & Simmons contract, "but equally the right of way along railways thereafter built by" the St. Paul & Pacific Railroad Company and its successors in interest, although such rights of way had not then been acquired, and their location was at the time unknown; that this perpetual easement, so termed, was undisturbed and continued to exist, notwithstanding the execution of the three subsequent telegraphic contracts mentioned in the foregoing statement; that these subse-

quent agreements, to wit, the Farley contract and contracts A and B, contained a further assurance of the right or easement theretofore granted; and that, at most, such subsequent contracts only abrogated those executory provisions of the Smith & Simmons contract which determined how the lines of telegraph, as between the telegraph company and the railroad company, should be operated and maintained. The circuit court further held that the easement thus imposed upon the right of way of the St. Paul & Pacific Railroad Company by the Smith & Simmons contract was not extinguished by the foreclosure of the mortgages under which the Manitoba Company, the present appellant, acquired the property, rights, and franchises of the St. Paul & Pacific Railroad Company, but that the property in question passed into the custody of the appellant burdened with the easement, which easement also became attached to all the lines of railroad subsequently constructed or acquired by the Manitoba Company. The decree from which the appeal is taken rests upon these fundamental propositions, which were decided by the learned judge of the trial court; and it depends mainly upon the proposition that the Smith & Simmons contract granted a perpetual easement of the kind above described, which could not be released or extinguished save by a formal written conveyance. In view of the important consequences deduced from this premise, it is the first proposition which deserves consideration.

It will be seen that the stipulations contained in the Smith & Simmons contract are generally of an executory character, and that they consist principally of personal covenants on the part of the contracting parties, all of which they could modify or discharge at their mere pleasure by an oral agreement to that effect, or by making another contract covering the same subject-matter, or by acts in pais clearly evidencing an intent to modify or discharge them. The only provision found within the four corners of the instrument which lends any color to the claim that the St. Paul & Pacific Railroad Company intended to grant a perpetual easement to erect and maintain lines of telegraph on rights of way which it then owned or might thereafter at any time acquire is found in the seventh paragraph, where it is said:

"The said party of the second part [the railroad company] does hereby grant to the said parties of the first part [Smith & Simmons], for the uses and purposes of this contract, and to keep off competing lines, the exclusive right of way for the lines of the telegraph along and upon the lands of the said party of the second part, as far as can be legally done."

It will be observed that there is here an express declaration that the right of way in question is granted for the uses and purposes of the contract, and to keep off competing lines, which, when fairly interpreted, means, we think, that the right granted was to be exercised during the existence of the contract, and would terminate whenever the contract was terminated by express agreement of the parties or otherwise. It was not intended, apparently, as a present grant of an interest or estate in the railroad right of way, to be held and enjoyed by the grantees for all time, independently of the provisions of the agreement, for, if such had been its purpose, it is not probable

that language would have been employed which qualifies the grant, and clearly implies that it was to be limited in its duration by the life of the contract in aid of which it was made. It seems most probable that this seventh paragraph was framed, not with a view of granting an estate in the right of way, which could not be extinguished save by a reconveyance, but, rather, with a view of preventing competing lines of telegraph from occupying it, and insuring to Smith & Simmons, as far as could be legally done, an exclusive right of occupancy for telegraphic purposes during the existence of the contract, and no longer. This was the dominant thought in the mind of the draftsman, and, such being the object which the contracting parties seem to have had in view, the provision in question is entitled to no greater force or effect than an agreement on the part of the railroad company that no other lines of telegraph should be erected on its right of way during the existence of the contract.

The foregoing view concerning the nature and purpose of the provision in question is confirmed by the subsequent acts of the parties in interest, and especially by the conduct of the Northwestern Company, in whose behalf the Smith & Simmons contract seems to have been negotiated, which are wholly inconsistent with the theory that the contract was intended to be a grant, or that it was supposed to contain a grant, of such an easement in the railroad right of way as is now asserted. The agreement which the Northwestern Company subsequently made with J. P. Farley in his capacity as receiver contains no reference to the Smith & Simmons contract, or to any interest in the right of way that had been thereby acquired. The same remark is true as respects contract A, which was subsequently entered into by the Northwestern Company with the Manitoba Company. The relations of the two companies were fully and carefully considered on the latter occasion, and an agreement was signed covering the manner of constructing and reconstructing lines of telegraph and the mode of operation, and granting permission to occupy the right of way, without a reference to any prior agreement, or an intimation that the Northwestern Company had before that time acquired any rights therein. Moreover, when the Northwestern Company transferred its lines of telegraph to the Western Union Company, on May 7, 1881, and professed to schedule and assign to the latter company all of its telegraphic contracts then in force, it did not schedule or otherwise refer to the Smith & Simmons contract as an existing agreement, upon which any rights could at that time be predicated. It is furthermore noteworthy that the last-mentioned contract was not pleaded in the answer of either of the defendants, or invoked as a defense or as the foundation of any right, in any form, until seven years after this action was instituted, when it was pleaded and attached as an exhibit to an amended cross-bill of the Northwestern Company. The Smith & Simmons contract appears to have been treated as functus officio by all persons and corporations concerned in the erection and maintenance of the telegraph lines now in controversy for many years before this action was instituted, and it is inconceivable that a contract of such moment could have been so effectually forgotten and so long ignored if the parties immediately

concerned in its execution, or if the Northwestern Company, ever supposed that it was intended as a present grant of such extensive rights in the railroad right of way as are now claimed by virtue of its provisions. When the Smith & Simmons contract was executed, it was doubtless assumed by the parties thereto that it conferred no rights as respects the railroad right of way, except such as could be released or modified by parol; that all the agreements contained therein were of an executory character, which could be annulled at the pleasure of the contracting parties; and that the contract would cease to have any vitality whenever a new contract was entered into, covering the same subject-matter, and containing other and different stipulations regulating the rights of the parties. We are of opinion that this is a correct view of the nature and effect of the Smith & Simmons contract; that it did not, on its delivery, burden the railroad right of way—even the one therein particularly described, between St. Paul and Watab—with an easement which could only be discharged by a formal conveyance, and that, notwithstanding the provisions contained in the seventh paragraph of the contract, the parties thereto and their successors in interest retained the power to otherwise define, settle, and establish their respective rights and interests in the telegraph line, and in the right of way upon which it was erected, by such future parol agreements on the subject as they saw fit to make.

It should be observed in this connection that the further proposition which appears to have been affirmed by the trial court, namely, that the Smith & Simmons contract granted a present and vested right, in the nature of an easement, in those rights of way which had not at the time been acquired by the St. Paul & Pacific Railroad Company, and had not even been located, has much less weight than the claim that such was the effect of the contract as respects the right of way between St. Paul and Watab, that had been located. The grant of an easement, if such a grant had been intended, as respects property which had not at the time been acquired by the grantor, and whose location was at the time unknown, had nothing to operate upon, and could not, in any event, have greater effect than an agreement to convey when the property was located and acquired. It created, at most, a mere equitable right to have the grant perfected when the property to which it appertained had been acquired, but until that time it was a right which could be relinquished orally or by acts in pais. Holroyd v. Marshall, 10 H. L. Cas. 191, 210, 211. Any equitable right is susceptible of extinguishment by an oral agreement unless the agreement runs counter to the statute of frauds. It is manifest, therefore, that the Smith & Simmons contract, whatever may have been its purpose, created no present estate or vested interest in rights of way that had not been acquired, which was of such a nature that it could not be released or extinguished save by a formal conveyance. Until such rights of way were located and acquired, and the alleged grant with respect thereto was perfected, it was competent for the parties to the contract, or their successors in interest, by an oral agreement, to relinquish whatever rights they had secured. We are likewise of the opinion, as already stated, that, while the claim to an

easement in the right of way between St. Paul and Watab may rest upon a somewhat better foundation, yet it cannot be sustained, and that such rights therein as were acquired by the Smith & Simmons contract were susceptible of relinquishment by the agreements which were subsequently made, although they were not, in form, conveyances.

Without stopping to inquire whether the Smith & Simmons contract was ever legally assigned to the Northwestern Company (a question that has been somewhat discussed), and assuming, without deciding, that the evidence relied upon to establish an assignment was adequate for that purpose, we pass to a consideration of the subsequent telegraphic contracts,—especially contracts A and B. The Farley contract of 1878 has little bearing, we think, on the present controversy, except as it forms a part of the history of the transaction; and any discussion of the questions which have also been mooted— whether that contract was one which Farley, as receiver, could lawfully make, and whether it was ever authorized or approved by the court which appointed the receiver—seems to be unnecessary.

Contract A deserves greater attention. That contract was entered into after the Manitoba Company had acquired all the property and franchises of the St. Paul & Pacific Railroad Company at the various foreclosure sales, and was the first agreement concerning telegraphic lines along its right of way to which it gave its express assent. The stipulations contained in that contract are plainly of an executory character, and no provision is found which can be construed as a grant of a common-law easement. It is a significant fact, already mentioned, that this contract contains no allusion to any prior agreement, or to rights previously acquired by either party. It deals with the relations thereafter to exist between the contracting parties, and with their rights and liabilities as a new subject-matter, upon the manifest assumption that neither party was embarrassed by prior agreements, and that the contract which was being made would necessarily displace and supersede all prior agreements between their predecessors in interest, if there were any. This contract was not limited as to its duration, but the twelfth and concluding paragraph secured to each party the right to a reconsideration and modification of its provisions upon an equitable basis after the expiration of 10 years, and at intervals of 5 years thereafter. It also, in express terms, bound the Northwestern Company to construct a line of telegraph "along and upon the right of way of any railroad now constructed or  *  *  * hereafter  *  *  *  constructed, owned, leased, or operated by the railroad company." But in view of the fact that lines of telegraph then existed along most, if not all, of the roads then constructed, some of which had been erected recently, it would doubtless be a reasonable and proper interpretation of this clause, and it is an interpretation to which we incline, that it only required the Northwestern Company to go over the existing lines of telegraph, and make them as good as new, without constructing absolutely new lines where they were not needed. We conclude, however, that contract A superseded all prior agreements between the predecessors in interest of the contracting parties, as they evidently intended that it should do. We also think that it

placed all the lines of telegraph theretofore constructed upon a plane of equality, so far as the rights of the parties therein or thereto were concerned, and that from the date of the execution and delivery of contract A, and until it was changed or modified, it became the measure of their rights and liabilities under and subject to those general rules of law in the light of which it must be considered and construed.

Turning next to contract B, which, though executed on August 23, 1882, was to take effect as of July 1, 1882, it will be seen that it differs from contract A, in that it not only recites a desire on the part of the contracting parties to cancel contract A, but expressly provides that it shall supersede that contract, "and all other agreements between the parties hereto or their respective predecessors"; thereby making plain a purpose which was left to be deduced by inference by the earlier agreement. In this contract, also, the attention of the contracting parties was directed to the ownership of the existing lines of telegraph then standing on the right of way of the railway company, and at the very commencement of the contract it was recited, in substance, that the parties (that is to say, the Manitoba Company and the Western Union Company), jointly owned all the lines of telegraph then in operation that were being operated under contract A. This seems to us to have been a very just and equitable view of their respective property rights in the lines of telegraph in question, in view of the manner in which they and their predecessors in interest had severally contributed to the erection and maintenance of said lines, and most likely it is the conclusion to which a court of justice would have arrived if it had been called upon at that time to determine the question of ownership. But be this as it may, the recital so made in contract B, forming, as it does, the basis and a part of the consideration for the other stipulations contained in that agreement, plainly estops the Manitoba Company and the Western Union Company from controverting the fact so recited and admitted. This proposition is so obvious that learned counsel for the Western Union Company, in the course of the oral argument, admitted that the Manitoba Company had a proprietary interest in, and was a joint owner of, all the lines of telegraph that had been erected, when contract B was executed, on the 853 miles of right of way then owned by the railway company.

It is urged, however, by the Northwestern Company, that the agreement entered into by itself with the Western Union Company on May 7, 1881, referred to in the foregoing statement, by virtue of which the Western Union Company acquired the possession and control of all the then existing lines of telegraph, did not empower the Western Union Company to put an end to contract A, and to substitute contract B in its place; or, to state its contention more accurately, it says that, while it had no interest in any modifications of contract A which might be made, yet that the Western Union Company had no power to consent to alterations therein "such as should affect its [the Northwestern Company's] vested rights." The Western Union Company joins in this contention, although it exercised, without any apparent doubt of its authority to do so, the right to negotiate and execute contract B, and recited in that contract that contract A had been "duly transferred" to it, and that its interest in the lines of telegraph to

which the agreement related was that of a joint owner with the Manitoba Company, on whose right of way they were erected.

The first observation to be made concerning this contention is that no provision found in the agreement of May 7, 1881, between the two telegraph companies, expressly conferred upon the Western Union Company the power to make any change in contract A without the consent of the Northwestern Company. The concession which is in effect made, therefore, that the Western Union Company could modify it if it thought proper to do so, is an admission that this power of modification was conferred by a clear implication from other provisions of the agreement. And this admission, we think, is a necessary one, when it is considered that by the eighth article of the agreement of May 7, 1881, the Northwestern Company covenanted that for 99 years it would not "engage in the business of telegraphy, nor build nor own any lines of telegraph, or hold the same by lease or otherwise." This was a covenant to suspend the exercise of all its vital functions, and to devolve upon the Western Union Company the performance of all the duties which, by the acceptance of its charter, it had engaged to perform. It must have been foreseen when it transferred all of its visible property and assigned all of its telegraphic contracts to the Western Union Company that in the course of a century it would be necessary to make repeated changes in these contracts; that it would likewise be found expedient in some instances, at least, to exchange certain contractual rights for others of greater value and importance; and as some of the contracts mentioned in the schedule of telegraphic contracts, which is attached to the agreement of May 7, 1881, expired by express limitation before the lapse of 99 years, it was known, of course, that, in the natural order of events, new contracts would have to be negotiated to take the place of those that had expired. In view of these considerations, and the fact that no limitation was placed upon the power of the Western Union Company to deal with these assigned contracts, or provision made requiring the assent of the Northwestern Company to proposed modifications, it must be inferred, we think, that it was the intention to leave the Western Union Company at full liberty to deal with them as it thought best. If it be conceded, as we think it is and must be, that the Western Union Company had the power to agree upon alterations in contract A and in the other assigned contracts, the inquiry arises, naturally, where is there any limitation upon the power in this respect? Why could it not consent to the cancellation of a particular contract, and the substitution of another in its place, as well as to a modification of one or more of its provisions? It is obvious that any change in the provisions of one of these contracts altered to that extent some right which the Northwestern Company had thereby secured when it was executed, and we are unable to draw any distinction between the rights so secured, or to say that one is any more sacred or vested than another. All of them were rights growing out of personal covenants made by the respective parties, which, as we have heretofore held, were capable of modification or extinguishment by parol. In other words, none of the contracts—not even the Smith & Simmons contract—contained a

present grant of an interest in the railroad right of way, which could only be relinquished by a conveyance.

There are other considerations which lead us to conclude that the Western Union Company had power to supersede contract A by contract B. By the agreement between the telegraph companies, the Northwestern Company, as before stated, abandoned the exercise of all its corporate functions for the long period of 99 years. It reserved to itself no power to resume the possession of its property and to re-engage in the business of telegraphy for any breach of the agreement between itself and the Western Union Company, save for a failure of the latter company to pay the taxes on the property which it had acquired, the interest on the bonds of the Northwestern Company, and the promised dividends to the stockholders of that company. Even these promised dividends were not to be paid to the Northwestern Company for distribution by it in the ordinary way, but were to be paid directly to the individual stockholders; and, since the agreement was entered into, the Northwestern Company, according to the evidence, has not kept a record of the transfers of its own stock, but has intrusted that duty to the Western Union Company, and, as it seems, does not know at the present time who are its shareholders, except as it may be advised by the last-named company. Obviously, therefore, it was understood by both of the contracting parties that the Northwestern Company should remain in a comatose condition during the life of the agreement, and the fact that it was left in this condition by the express provisions of that instrument may account for the alleged fact, if it be a fact, that it was not consulted when contract B was executed, and remained ignorant of its provisions until the commencement of the present litigation. In view of considerations such as these, we are constrained to believe that the provision contained in the agreement of May 7, 1881, whereby the Western Union Company covenanted to restore the lines of telegraph to the Northwestern Company at the expiration of 99 years, affords no evidence of an intention to so restore them, or of an expectation on the part of either company that they would be restored, and that the Northwestern Company would at that remote period resume the exercise of its corporate functions. This provision, we think, was merely colorable; the real purpose of the agreement being to effect a merger of the business of the two companies, and to place it under the sole direction and control of the Western Union Company. The purpose so apparent on the face of the instrument, of effecting a practical consolidation of telegraph lines by means of an agreement which has some resemblance to a lease, although neither the word "lease" nor the word "demise" is found therein, is of much importance, and entitled to great weight in determining what power was intended to be devolved upon the Western Union Company with respect to dealing with the assigned telegraphic contracts. It has sufficient weight, we think, to justify the conclusion that it was the intention of both of the telegraph companies to vest the Western Union Company with authority to modify the assigned contracts, or to supplant them by new agreements,—in other words, to deal with them as it thought best. The Northwestern Company intended, we think, to intrust the protection of its interest

in the matter of the negotiation of new contracts with railroad companies to the Western Union Company, upon the assumption, no doubt, that the interests of the two companies in this respect were practically identical. And this seems to have been the view which was prevalent about the time the agreement of May 7, 1881, was made, for in a letter written by the assistant general manager of the Manitoba Company to the President of the Northwestern Company on September 9, 1881, the agreement in question is spoken of as a "sale" of the Northwestern Company's interest, while in a letter written by the president of the Northwestern Company to the Manitoba Company on March 13, 1882, he informed the Manitoba Company that he was advised that the Western Union Company was ready to meet it in the negotiation of a "new contract," if it so desired; evidently believing that it was within the power of the Western Union Company to make a new contract if it thought proper to do so.

Relative to this branch of the case, it should be further observed that by contract A the Northwestern Company undertook the performance of certain active and continuous duties,—such, for example, as the construction of new lines of telegraph as the Manitoba Company extended its lines of railroad or acquired other roads. These duties it has not discharged since August 23, 1882, when contract B was executed, but has been in default for years, unless what has been done by the Western Union Company under the latter contract be accepted as a performance by the Northwestern Company of the acts which it engaged to do and perform. The Northwestern Company insists at this time that it is not, and never has been, in default, and that what has been done under contract B inures to its benefit as a full performance of its obligations under contract A. It also lays claim to all the new lines of telegraph that have been erected since August 23, 1882, irrespective of the fact that these lines were built by the Western Union Company in pursuance of the provisions of contract B, which it executed in its own name and behalf, representing itself at the time to be a joint owner of the then existing lines. Now, as one cannot adopt and claim the benefit of acts done by another in his own name, and ostensibly on his own account, unless he has previously given that other authority to do the acts in question (Hamlin v. Sears, 82 N. Y. 327, 330; Railroad Co. v. Gazzam, 32 Pa. 340, 347, 348; Mitchell v. Association, 48 Minn. 278, 284, 51 N. W. 608; Mechem, Ag. § 127), it may be that the Northwestern Company, by claiming the benefit of all that has been done by the Western Union Company under contract B, and by asserting its ownership of the new lines constructed in pursuance of its provisions, should be held to have thereby admitted the power of the Western Union Company to enter into that contract. Without reference, however, to the position so assumed by the Northwestern Company, and to the claim which it makes in the respect last mentioned, we are of opinion, for the reasons above stated, that the Western Union Company acted within the scope of its authority in consenting to the cancellation of contract A, and the substitution of contract B in its place, and that the provisions of this latter contract are binding alike upon both telegraph companies. Such, unquestionably, was the understanding of both con-

tracting parties when contract B was executed, and they have acted on that understanding for years, ignoring the provisions of all prior agreements.

This brings us to a consideration of the question, to whom do the lines of telegraph now in controversy belong? As respects the lines that had been constructed on July 1, 1882, this question was answered by the parties themselves, by the recital contained in contract B; the recital being, in substance, that they were owned jointly by the Western Union Company and the Manitoba Company, which we understand to be an admission that they were equal joint owners, inasmuch as they and their predecessors in interest had contributed about equally to their erection and maintenance. And as neither of the contracting parties undertook by that agreement, or manifested an intent, to transfer or relinquish its proprietary interest in said lines to the opposite party, it must be true, we think, that they continued to remain the joint property of the two companies at least until contract B expired by limitation.

The lines that were erected after July 1, 1882, under the provisions of contract B, were constructed at the sole cost of the Western Union Company for the labor, superintendence, tools, and materials which were employed and used in their erection. The Manitoba Company made no contribution to the erection of these lines, in the shape of money, labor, or materials, save that it distributed the materials therefor free of charge, when said materials had been delivered at any of its stations, and also transported the employés of the telegraph company, when engaged in its business, free of charge. The new lines erected after July 1, 1882, were in reality created by the Western Union Company; being almost exclusively the product of its money, time, labor, and skill. In view of this fact, and the further circumstance that the lines in question were erected by consent on the railroad right of way, and on the express understanding, as evidenced by the terms of contract B, that they should "form a part of the general [telegraphic] system of the telegraph company," we are of opinion that the lines (meaning by that the poles, wires, batteries, etc.) belonged, when completed, to the company whose money and labor had erected them, and that they remained its property at least until the expiration of contract B. W. U. Tel. Co. v. Burlington & S. W. R. Co. (C. C.) 11 Fed. 1, 5. It has been held by the highest authority that the track of a railroad company, when laid on the land of another with his consent, does not necessarily become a part of the land, and the property of the owner of the fee, although the ties are imbedded in the soil. Wiggins Ferry Co. v. Ohio & M. R. Co., 142 U. S. 396, 415, 12 Sup. Ct. 188, 35 L. Ed. 1055. And no reason is perceived why a telegraph line, when erected, necessarily becomes a part of the realty because the poles are set in the earth. Whether the poles and wires lose their character as personalty, and become the property of the owner of the fee, depends in a great measure upon whether the one who erected them and strung the wires thereon intended such a result. Railway v. Dunlap, 47 Mich. 456, 465, 11 N. W. 271; Navigation Co. v. Mosier, 14 Or. 519, 13 Pac. 300, 58 Am. St. Rep. 321. Besides, the parties to contract B assumed when they executed it that the ex-

isting lines of telegraph had not become realty by attachment to the soil, or at least that the principles of natural justice required them to concede as much, for by that agreement they freely admitted that as they had contributed about equally to the erection of the then existing lines, and had constructed them for their mutual benefit and advantage, they were joint owners thereof, notwithstanding the fact that the poles stood on the railroad right of way. We but apply the same doctrine when we decide that the lines which were erected after July 1, 1882, at the sole cost of the Western Union Company, after their erection remained its property.

It is suggested, however, by the Manitoba Company, that when contract B expired by limitation on July 1, 1892, all the lines of telegraph in controversy became its property, irrespective of the question of ownership prior thereto, because they stood at the time on its right of way, and were not removed during the life of the contract. By this contention the appellant invokes in its favor the application of a rule of law which applies as between a landlord and his tenant, and between an owner of land and one who without permission permanently attaches some structure thereto, but it does not seem to us to be a rule which is at all applicable to the case in hand. No such relation as that of landlord and tenant existed between the railway company and the telegraph company, nor were the lines of telegraph now claimed by the former as its exclusive property erected upon its right of way without permission. On the contrary, they were placed there with its express sanction, and not for its accommodation only, but also for the benefit and advantage of the Western Union Company. They were also placed there upon the express understanding that the telegraph company intended to make the lines, when erected, an integral part of a great and ever-growing telegraphic system. Again, the parties between whom the agreement for the erection of the telegraph lines was made were quasi public corporations, both of whom were engaged in interstate commerce, and both of whom were equally bound to render important public services without interruption. Neither of these companies were endowed with the large powers and franchises which they possess with the intent that they should be exercised solely or mainly for the benefit of the shareholders, but all such powers and franchises were granted upon the implied understanding that they should be exercised in a manner which would be most conducive to the public welfare and convenience. Aside from these considerations, it appears that when contract B was entered into the railway company had already extended its road into North Dakota, and had in contemplation at that time a further extension of its main line, as well as the construction of branch lines,—such an extension, in fact, as would enable it to keep pace with the development of the country and the progress of civilization. In this situation the parties entered into a contract which bound the Western Union Company to construct a substantial line of telegraph along the railroad right of way as fast as any new road was projected and built, and as new lines were acquired, and to do so substantially at its own expense. During the life of the contract the railway company carried out its purpose of extending its road from its original terminus, and actually

extended it to the Pacific Ocean; thereby imposing on the telegraph company. the duty, which it faithfully performed, of constructing two or three thousand miles of telegraph line, over five hundred miles of which was built during the last three years of the contract period.

In view of these considerations, it is obvious, we think, that neither the railway company nor the telegraph company, when they entered into contract B, expected that the lines of telegraph to which the agreement related would be removed from the railroad right of way on the expiration of the agreement, or desired them to be so removed. Very likely, it would have been physically impossible to have effected a removal of the lines on the day the contract expired, if the parties had so desired, and until the very end of the contract period the right existed to maintain the lines on the right of way. Besides, as the Manitoba Company laid claim to all the lines, and asserted that it was the sole owner thereof by reason of their being on its right of way, and would doubtless have resisted the removal by legal process if the attempt had been made, it cannot at this time found any lawful claim to the telegraph lines, based upon the ground that they were not removed from its premises during the contract period. In other words, the telegraph company cannot be said to have been in default, or to have lost any of its rights as respects the lines in question, because it failed to do what the railway company asserted at the time that it had no legal right to do, and would have resisted if the act had been attempted. So long as a controversy existed as to the ownership of the lines, it had the right to wait until that controversy was determined, and did not sacrifice any of its rights by so doing.

In view of the considerations aforesaid, it is likewise manifest, we think, that the Western Union Company did not enter into contract B with the understanding that the clause found in the twelfth paragraph, declaring that it should "continue in force for the term of ten years," would have the effect of transferring to the railway company, at the end of the contract period, all the lines,—those already existing, of which it was then a joint owner, as well as those which it might subsequently erect at its sole cost and expense. That view of the effect of the contract, involving, as it did, the relinquishment on its part of its interest in the lines jointly owned, and in other lines of telegraph, erected at its own expense, which might be two or three thousand miles in length, and involving, as well, the disruption pro tanto of its telegraphic system, renders it altogether too unreasonable, not to say unconscionable and absurd, to warrant a court of justice in presuming for a moment that the telegraph company intended to enter into such an agreement, or supposed that it had done so. It is a general rule for the interpretation of contracts, as well as for the interpretation of statutes, that they should not be so construed as to lead to injustice, oppression, or absurd consequences, if such a result can be avoided. U. S. v. Kirby, 7 Wall. 482, 486, 19 L. Ed. 278; Lau Ow Bew v. U. S., 144 U. S. 47, 59, 12 Sup. Ct. 517, 36 L. Ed. 340; Holy Trinity Church v. U. S., 143 U. S. 457, 461, 12 Sup. Ct. 511, 36 L. Ed. 226. Some other interpretation of the provisions of contract B, which is more reasonable, must accordingly be adopted, if the language of the instrument and the environment of the parties

will permit. Looking at the situation and relations of the parties at the time contract B was executed, we think that it is entirely reasonable to infer that the clause declaring that the contract should continue in force for 10 years has reference to the terms upon which lines of telegraph should be constructed, maintained, and operated during that period, and that it was not intended to have any effect upon the ownership of the lines,—either those that were then standing, which belonged to the parties jointly, or those which might be afterwards constructed. If it had been the mutual understanding of the contracting parties that the lines were to become the sole property of the Manitoba Company at the end of the contract period, then it is wholly unaccountable that a stipulation to that effect, covering such an important subject-matter, was not inserted in the contract. And the fact that no such provision is found in the agreement raises a strong presumption that such a result was not within the contemplation of either party. They foresaw that after the expiration of 10 years it might be inexpedient and inequitable, owing to altered conditions, to further construct, maintain, and operate lines of telegraph on the railroad right of way on the terms specified in contract B. They accordingly agreed that the arrangement as made should continue in force 10 years, leaving the parties at full liberty after that time to enter into other and different arrangements if they thought proper. They did not intend, however, by this clause, to extinguish the telegraph company's interest in the lines of telegraph at the end of the contract period, nor would it be either just or reasonable to deduce the conclusion that such was the necessary legal effect of the clause in question, or the necessary effect of any other provision of the agreement.

In conclusion, on this branch of the case, it is proper to add that we entertain no doubt that the railway company was aware when it executed contract B that the telegraph company did not construe that agreement as having the effect now contended for by the railway company,—that is to say, as amounting to a relinquishment by the telegraph company, at the end of 10 years, of all its interest in the existing lines, and of its interest in such new lines as it might construct in the meantime. It knew very well, we think, that the telegraph company viewed the contract in a different light, and believed that its property rights would not be impaired by any of its provisions. It matters not, therefore, that the railway company may have interpreted the contract differently, or that it may have entertained a secret purpose of claiming the lines as its sole property when the contract expired by limitation, for a party to an agreement will be deemed to have assented to it in the sense which he knew the opposite party intended it to have when the latter executed it, provided the language employed is fairly susceptible of the meaning which the opposite party imputed to it. Aluminum Co. v. Lowrey, 24 C. C. A. 616, 628, 79 Fed. 331.

The result is that we reach the following conclusions: First, that the Manitoba Company and the Western Union Company on July 1, 1882, were equal joint owners of all the lines of telegraph that had been erected on the railroad right of way prior thereto, and that their interests therein remain unchanged at the present time; second, that the Western Union Company is the owner of the lines erected since

the latter date at its own cost and expense, subject, however, to a reasonable allowance to the railway company for its services in distributing the materials for their erection; and, third, that their respective interests as aforesaid were unaffected and unimpaired by the termination of contract B. These conclusions are announced, however, without prejudice to the rights of the two telegraph companies inter sese; leaving them at full liberty to litigate concerning those rights as they may be advised.

The railway company does not pray in its bill of complaint for the removal of any of the lines of telegraph from its right of way, and obviously does not desire them to be removed. It asserts, rather, that it is the sole owner of the lines, and asks that its ownership may be established by judicial decree, and that the telegraph company be enjoined from interfering with its possession and entering upon its premises for the purpose of maintaining and operating the lines. This, then, is the substantial relief which the railway company seeks, and the only relief which could be accorded to it. On the other hand, as has appeared heretofore, the telegraph companies assert that they are the sole owners of the lines, and that they have the right to maintain them perpetually on the railroad right of way. In their cross-bills, however, the telegraph companies pray, in substance, that if the court rejects the claim to a perpetual easement, and is of opinion that the lines of telegraph are erected upon any portion of the right of way which they no longer have the right to occupy for telegraphic purposes without making due compensation, it will fix the amount of compensation to be paid, and the terms upon which the lines shall be maintained and operated in future, and that upon payment of the sum so ascertained it will decree that the lines be allowed to remain where they now are. It would seem, therefore, that the substantial controversy between the parties is that concerning the ownership of the lines, and the existence of a perpetual easement, which controversy has already been determined. These questions having been decided, there is a strong probability that the parties will be able to come to an agreement relative to the future maintenance and operation of the lines upon the premises where they now stand, since neither party seems to desire their removal. A stay of further proceedings in the case for the period of six months, or more if counsel so desire, should, in any event, be ordered, to enable the parties to effect such an agreement if they are so disposed.

We are of opinion that it is competent for a court of equity, in the situation which confronts us in this case, to fix the compensation to be paid to the railway company for the use of its right of way for the future support and maintenance of the telegraphic lines which were erected thereon subsequent to July 1, 1882, under the provisions of contract B, and that this power should be exercised if it so happens that no agreement can be reached by the parties themselves with respect thereto, and the railway company shall insist in future upon their being removed from its premises. Telegraph companies are recognized everywhere as common carriers of information, and such important factors in the transaction of interstate commerce as to bring them within the protection of the federal government, and subject them

to its regulation and control. Pensacola Tel. Co. v. W. U. Tel. Co., 96 U. S. 1, 9, 24 L. Ed. 708. So important are the public functions which they perform, that an act of congress passed on July 24, 1866 (Rev. St. § 5263 [U. S. Comp. St. 1901, p. 3579] ), gave to telegraph companies who accepted the provisions of the act, in broad terms, the right to construct and maintain their lines "over any portion of the public domain of the United States, * * * and along any of the military or post roads of the United States which [had] been or [might thereafter] be declared such by law," provided they were so constructed as not to interfere with travel on such military or post roads. A subsequent act of congress (Rev. St. § 3964 [U. S. Comp. St. 1901, p. 2707] ) declared all railroads then or thereafter in operation to be post roads; and while the construction placed on the former act has been that it does not give to a foreign telegraph company in any state the right to enter upon private property and set its poles without the owner's consent (Pensacola Tel. Co. v. W. U. Tel. Co., supra; Western Union Tel. Co. v. Ann Arbor R. Co., 178 U. S. 239, 243, 20 Sup. Ct. 867, 44 L. Ed. 1052), yet, if a telegraph company erects its poles on a railroad right of way with the consent of the owner, as in the present instance, and its poles and wires in no wise interfere with travel or the operation of the railroad, no reason is perceived why a court of equity should compel it to remove its lines from the right of way, if the telegraph company is willing to pay a reasonable compensation for its use, especially where it appears that no express agreement was made that they should be removed, when the lines were erected. Furthermore, the statutes of the state of North Dakota (Rev. Code 1899, § 5956) expressly confer upon telegraph companies the right to exercise the power of eminent domain for the location of their lines, and we presume that similar statutes have been adopted in some, if not all, of the states where other portions of the lines in controversy are located. This power, of course, cannot be exercised for the condemnation of rights of way over property already devoted to a public use, if the new use would materially interfere with the old; but it is not apparent that the existence of a telegraph line on a railroad right of way, where such lines are usually erected, would materially interfere with the operation of any railroad, and in the present instance it is conceded that there would be no such interference.

It has been held, and the proposition seems to be well established by authority, that where a corporation which has the right to acquire property by an exercise of the power of eminent domain has taken possession of property, and has erected or is engaged in the erection of structures thereon, but has not complied with some condition precedent necessary to render its acts in all respects lawful (such, for instance, as a failure on its part to pay some person the damages necessarily incident to the maintenance of the structure), and such person appeals to a court of equity for an injunction to restrain the maintenance or to compel the removal of the structure, the court to which such appeal is made has the power to determine the amount of the unpaid damages, and to withhold an injunction, and direct that the structure be permitted to remain and be operated, provided the

assessed damages are paid. Courts of equity will, as it seems, the more readily pursue such a course when important public interests are at stake, and a contrary course would be productive of much public inconvenience and annoyance. City of New York v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820; Pappenheim v. Railway Co., 128 N. Y. 436, 444, 28 N. E. 518, 13 L. R. A. 401, 26 Am. St. Rep. 486; Shepard v. Railway Co., 117 N. Y. 442, 448, 23 N. E. 30, and cases there cited. See, also, Osborn v. Missouri Pac. R. Co., 147 U. S. 248, 259, 13 Sup. Ct. 299, 37 L. Ed. 155; Joy v. City of St. Louis, 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843; McElroy v. Kansas City (C. C.) 21 Fed. 257.

We think, therefore, that the decree should contain a provision authorizing the Western Union Company, if it fails to come to an agreement with the railway company, and the latter company shall insist upon a removal of the lines, to apply to the court at the expiration of the aforesaid stay of proceedings for the appointment of a master and two commissioners to assess such reasonable compensation as they think ought to be paid by the Western Union Company for the privilege of maintaining the lines of telegraph erected since July 1, 1882, where they now are, and the compensation to be paid for the distribution of material when the lines were built. The lines erected prior to that day do not stand on the same footing. They are the joint property of the railway company and the telegraph company, and were placed on the former's right of way by mutual consent of the joint owners, where they have ever since remained; and, as this is not a proceeding in partition for the severance of their joint interests, the lines in question should remain where they are, subject to joint user until the joint ownership is extinguished by agreement or by a suit instituted for that purpose.

As it may happen that the court will have no occasion in future to fix the compensation to be paid by the telegraph company for the use of the aforesaid right of way, it is not deemed necessary at this time to consider the question whether any part of the right of way on which lines of telegraph were erected subsequent to July 1, 1882, was acquired by the railway company under such circumstances as entitle the telegraph company to use it without the payment of any compensation. This question may properly be deferred until the occasion arises for its determination.

The decree below is accordingly reversed, and the case is remanded to the circuit court, with directions to vacate its former decree, and in lieu thereof to enter a decree embodying the foregoing conclusions, and containing, among others, the following provisions: That is to say, establishing the ownership of the lines of telegraph as hereinbefore adjudicated; directing a stay of all further proceedings in the cause for the period of six months or more from the date of entering the decree, as may be agreed by counsel, and providing that in the meantime the lines of telegraph shall be maintained, operated, and used in all respects as heretofore, unless the parties shall otherwise mutually agree; also granting permission to the Western Union Company, as heretofore more particularly explained, to apply for the appointment of a master and two commissioners to fix the compen-

sation to be paid by the telegraph company for the use of the right of way and the distribution of materials; such application to be made on 60 days' notice to the appellant, and reserving to the court, should such an application be made, full power and authority, on the coming in of the report of said commission, to determine, with respect to any part of the right of way, whether it was acquired by the railway company under such circumstances that the telegraph company should be permitted to use it without compensation. The costs in this court will be divided equally between the contending parties.

SANBORN, Circuit Judge (dissenting). While I agree in the main with the views expressed and the results reached in the opinion of the court, there is a single conclusion there announced to which I am unable to subscribe. I concur in the view that the telegraph company acquired no right of way over the property of the railway company after the expiration of the term of the contract of 1882 and that the two corporations are the joint and equal owners of the lines of telegraph constructed prior to the commencement of the term of that contract. But the facts and considerations which lead to these results seem to me to impel with equal cogency to the conclusion that the lines of telegraph constructed under the contract of 1882 are also the joint property of the two corporations that erected and used them. The rights of these two corporations in these lines rest upon and are fixed by the contract of 1882, and are determinable by a proper construction of its terms. The decree in this suit must be founded upon that contract, and can lawfully go no further than to practically enforce its specific performance. The majority of the court finds in that contract an agreement by the telegraph company to pay the railway company for the distribution of the materials which were used in the construction of the lines erected after July 1, 1882, and an agreement of the railway company that the telegraph company is the sole owner of these lines, and directs a decree to that effect. Careful and repeated perusals of the contract have failed to disclose to my mind any agreement, or any intention to make an agreement, that either of the parties to this contract should become the sole owner of any of these lines, or that either of these parties should ever pay to the other any compensation whatever for the things done or furnished in the construction or maintenance of the wires or poles. I have been unable to find any agreement in this contract that the railway company should pay the telegraph company for the materials the latter furnished for the construction or maintenance of the property, or that the telegraph company should pay the railway company for the distribution of any of the materials furnished by the telegraph company, or for the labor which the railway company bestowed upon the maintenance and repair of the lines. On the other hand, the agreement, in its first and second paragraphs, expressly provides that the telegraph company shall furnish the materials and labor for the stretching of new wires, and the materials for the construction and repair of all wires, "at its own expense," and, in its seventh paragraph, that the railway company shall distribute these materials (those furnished for construction, as well as those furnished for reconstruc-

tion, repair, and maintenance) "free of charge"; and the entire contract seems to me to contemplate the prosecution of a joint enterprise; to evidence a joint ownership of all the property of which it treats,—of that to be produced under it, as well as of that already in existence; and to set forth the specification of those things which each owner should contribute toward the construction and maintenance of the joint property, together with the extent of the use of it which each owner should enjoy.     My mind has been forced to this conclusion by the following considerations:

1. The parties to the contract were joint owners of the lines of telegraph along 853 miles of the railroad, and this was an agreement between them for the repair and extension of these lines.     The contract provided that the parties were joint owners of the existing lines; provided what should be contributed by each to the reconstruction and maintenance of the lines in existence, to the erection of additional wires upon them, and to the construction, reconstruction, and maintenance of their extensions; and specified the limits of the use which each corporation should enjoy of the lines already in existence and of those which were to be erected.     The facts that this was a contract for the reconstruction and extension of property jointly owned, and that the agreement recited this joint ownership, and provided for no other, persuasively argue that it was the intention of the parties, and the effect of the contract, to vest in each of them the same title and interest in the additions to and extensions of their joint property that they already had in the property itself.     When joint owners of property agree to add to or to extend it, stipulate the amounts which each shall contribute to the additions or extensions, and make no stipulation that the title of the additions or extensions shall differ from that of the existing property, the natural inference is that the title and ownership of the additions or extensions is the same as that of the property to which these additions or extensions are made.     If an additional wire was stretched, under the second paragraph of this contract, along the 853 miles of railroad by the side of which the telegraph lines were already constructed when this agreement was made, that wire became the joint property of the two parties to this contract.     The contributions of the two parties to the stretching of this wire were the same as were their contributions to the erection of the extensions of the lines.     If this additional wire or any other wire or line was extended beyond the 853 miles under this identical contract, it seems to me that its ownership must be the same as that of the original wire or line.

2. The contract contains no provision that either party shall compensate the other for any materials furnished or services rendered by the other in the construction, repair, or maintenance of any of the lines or wires.     When one party renders services or furnishes materials to produce or preserve the property of another, the latter usually pays or agrees to pay him for his materials or labor.     But when joint owners furnish materials or render services to produce, extend, or preserve their joint property, or when one constructs or maintains his own property, no compensation or stipulation for compensation is ordinarily made, because the ownership of the property produced

itself compensates for the labor or material. The fact that each of these parties agreed to contribute and did contribute certain materials and labor specified in the contract, to the additions and extensions to the joint property in existence, without any agreement that either should compensate the other therefor, strongly indicates their joint ownership of the new wires and lines, and that their joint title to them constituted the inducement and the compensation for their contributions.

3. The contract requires the parties, respectively, to furnish the same materials and to render the same services in the construction, reconstruction, repair, and maintenance of wires and poles on the lines already in existence when the contract was made, and which it declares were jointly owned, that it does in the construction, reconstruction, repair, and maintenance of the wires and poles to be subsequently erected under it. The broad terms of the agreement are that the telegraph company shall furnish the materials and the labor for every new wire stretched; that it shall furnish the materials and tools for the reconstruction, repair, and maintenance of all lines; that the railway company shall distribute the materials and furnish all labor for the reconstruction, repair, and maintenance of all the wires and poles. These terms apply uniformly and with the same force and effect to the lines constructed prior to July 1, 1882, and to those which were erected after that date. Thus the first paragraph of the contract provides that the telegraph company shall furnish all the materials and tools for the maintenance, repair, and reconstruction of the lines previously erected. But it also provides that it shall furnish all the materials and tools for the maintenance, repair, and reconstruction of all the wires and lines that shall be subsequently constructed under the agreement. The second paragraph provides that the railway company shall furnish all the labor for the maintenance, repair, and reconstruction of the lines subsequently constructed. But it also provides that it shall furnish all the labor for the maintenance, repair, and reconstruction of the lines previously erected. The same paragraph provides that the telegraph company shall furnish all the labor for the erection of the new wires on the lines to be constructed. But it also provides that it shall furnish all the labor for the stretching of all new or additional wires on the lines previously built. The seventh paragraph requires the railway company to transport and distribute free of charge all materials for the construction, maintenance, operation, repair, or reconstruction of the extended lines. But it also provides that it shall transport and distribute in the same way all the materials for the reconstruction and repair of existing lines, and for the stretching of additional wires thereon. The fact that the contract requires the same contributions from each of the parties to the construction, repair, and maintenance of the wires and poles upon the extensions that it requires of them for the construction, reconstruction, repair, and maintenance of the wires and poles along the lines which were already in existence, and which were jointly owned, is very persuasive evidence that the ownership of the extensions and additions was the same as that of the lines to which these extensions and additions were made.

4. The contract provides that the respective parties shall have the same measure of use of the lines constructed after the commencement of its term that they shall have of those erected previous to that date. It requires the telegraph company to stretch and set apart for the exclusive use of the railway company, on the existing as well as on the contemplated lines, as many wires as shall be necessary to transact its railway business, and it requires the railway company to maintain them. It calls upon the telegraph company to furnish instruments, local and main batteries, on the same terms for the operation of the old as for the operation of the new lines. Indeed, there is no provision of the contract relative to the operation and use of the wires and lines which does not apply with equal force and pertinency to the lines constructed before and to those erected after the 1st of July, 1882.

The situation and relations of the parties when they made this contract of 1882, and the terms of this agreement to which reference has now been briefly made, seem to me to point unerringly to the conclusion that the parties to it became joint owners of the new lines constructed under it, as they were of the old lines which were in existence when the contract was made, and to which the new lines were mere additions or extensions. The joint ownership of the existing lines when the contract was made; the joint nature of the enterprise of which the contract treats, and of the contemplated undertaking, to wit, the extension of telegraph lines jointly owned along the extending railroad on which they were stretched; the provisions of the contract that the parties should make their respective stipulated contributions to the construction, reconstruction, and maintenance of the lines free of charge, as they would naturally contribute to the production or extension of their joint property; the fact that the contract requires the respective parties to make the same contributions to the stretching of additional wires along the constructed lines as to the stretching of new wires along the extensions, and the same contributions to the reconstruction, repair, and maintenance of the new lines as to the reconstruction, repair, and maintenance of the existing lines which were jointly owned; the fact that the contract secured to each party, upon the same terms, the same measure of use of the lines constructed prior to the commencement of its term which were jointly owned as of those subsequently constructed,—all these facts and considerations converge with compelling force to prove that the parties to this contract became joint owners of all the wires stretched and lines of telegraph constructed under it, as they were of those to which these wires and lines were additions and extensions. In my opinion, this court should direct the entry of a decree that the wires stretched and lines of telegraph constructed under this contract became the joint property of the telegraph company and the railway company, instead of the directions regarding these lines contained in the opinion of the majority, and should leave them in that condition until the joint ownership is extinguished by agreement or by subsequent proceedings in the court below in this or some other suit for that purpose.