J. H. Marks.<br>
H. L. Marks.<br>
Marietta Marks.<br>
A. J. Terry.

</div>

(Acknowledgment and filing certificates omitted.)

---

## BALTIMORE & O. R. CO. v. WESTERN UNION TELEGRAPH CO.

### (District Court, S. D. New York.· February 19, 1917.)

1. SPECIFIC PERFORMANCE ⬤⇒62—RIGHT TO RELIEF—ADEQUATE REMEDY AT LAW—RAILROAD AND TELEGRAPH CONTRACT.

   A complaint by a railroad company against a telegraph company for the specific performance of a provision of the contract between them that the telegraph company should transmit free messages pertaining to railroad business on lines not located along the railroad up to a certain amount each year and thereafter should transmit such messages at one-half its regular rates, which clause the telegraph company claimed was ,contrary to the Interstate Commerce Act, sets up a cause of equity ; there being no adequate remedy at law.

   [Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 188.]

2. TELEGRAPHS AND TELEPHONES ⬤⇒34—REGULATION—FREE MESSAGES—CONTRACT WITH RAILROAD—"EXCHANGE."

   In 1887, a railroad company and a telegraph company entered into a contract which was to continue for 50 years, and which provided for the joint operation and· maintenance of telegraph lines along the railroad right of way in accordance with numerous provisions, among which was one that the telegraph company should transmit for the railroad company on its lines along the railroad all railroad messages free of charge and on its lines not located along the railroad messages pertaining to railroad business free of charge up to a certain amount each year measured by the company's regular rates and additional messages at half the regular rates. A similar provision was made for the transportation of the tele-'graph company's employés and material by the railroad company. By Act June 18, 1910, .c. 309, 36 Stat. 544, Congress amended section 1 of Inter-

state Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 (Comp. St. 1913, § 8563), so as to make that act apply to telegraph companies, but with a proviso that it should not prevent them from entering into contracts with common carriers for exchange of services, and a further proviso that the clause preventing free transportation of passengers should not be construed to prohibit the privilege of passes or franks or the exchange thereof with each other for the officers, agents, and employés and their families of telegraph companies and other common carriers. This amendment was adopted after Congress had received two reports of the Interstate Commerce Commission in which they both had construed the existing provisions of the act relating to railroads as permitting the free transportation of telegraph employés and equipment for service or use along the line of the railroad, but not for service or use off the line, but had stated that the public interest would not be adversely affected by the full performance of such contract between the railroad and telegraph companies. The Interstate Commerce Commission construed the provisos added by the amendment of 1910 as permitting the exchange of services off the line of the railroads only on the basis of the regular rates charged therefor by the carriers and the telegraph companies. *Held*, that the provisos in the amending act, whether construed according to their literal wording or by a resort to the history of the times to ascertain the intent of Congress, permitted the observance of the exchange clauses as they were set forth in the contract, since "exchange" is the giving or taking of one article other than money for another article other than money which is regarded as the equivalent without reference to money value, and, if Congress had desired to preserve distinction between on the line and off the line services theretofore made by the Interstate Commerce Commission, it could easily have done so.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21.

For other definitions, see Words and Phrases, Exchange.]

3. STATUTES ⬤⟶212—CONSTRUCTION—KNOWLEDGE OF CONGRESS—STATUTES AND DECISIONS.

It can be assumed that Congress, in amending the Interstate Commerce Act so as to apply to telegraph companies, had in mind the necessarily intimate relations between the railroads and the telegraph companies shown by its own acts and by the decisions of the courts.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 289.]

In Equity. Suit by the Baltimore & Ohio Railroad Company against the Western Union Telegraph Company. On hearing on bill and answer. Decree rendered for plaintiff.

The cause having come up on bill and answer, plaintiff seeks a decree adjudging that: (1) A certain contract between the parties is lawful and in full force and effect; (2) defendant specifically perform the contract; and (3) plaintiff have an injunction against defendant restraining it from violating the provisions of the contract.

On October 15, 1887, the parties entered into the written contract here under consideration. (The numbers hereinafter refer to paragraphs of the contract.)

### The Contract.

(1) Enumerated by reference to a schedule the railroads owned by plaintiff (hereinafter called "Railroad").

(2) Enumerated by reference to a schedule the (a) exclusive railroad wires and (b) commercial wires of defendant (hereinafter called "Telegraph Co.") and provided that "exclusive railroad wires" should be deemed to include the necessary instruments and connections, as then located and used on said wires and as necessary to continue in operation the existing effective telegraphic circuits between the several stations and offices of the Railroad in the various places

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

on the routes of the railroads then owned, leased, operated or controlled by the Railroad, etc.

(3) The Railroad was to retain the ownership of said "exclusive railroad wires."

(4) The Telegraph Co. agreed to maintain, repair, and construct, at its own cost, all the telegraph lines specifically covered by said contract and such additional wires as either the Telegraph Co. or the Railroad might place thereon, the Railroad, however, to furnish the necessary unskilled labor for such maintenance, repairs, and reconstruction, and the necessary wire and material, not including brackets and cross-arms, for the maintenance, repair, and reconstruction of the "exclusive railroad wires." The location of any poles, wires, or cables upon the right of way or property of the Railroad should, from time to time, be changed thereon in such manner as the officers of the Railroad might direct, so as not to interfere with the operations of the Railroad, the Telegraph Co. furnishing the skilled labor, and the Railroad the unskilled labor for such work.

(5) The Railroad should have the right to acquire from the Telegraph Co., or to erect, additional "exclusive railroad wires" upon the telegraph lines covered by the contract, the Railroad paying the cost of material, not including brackets and cross-arms, and of direction and equipment, etc. The Railroad should not be required to furnish any labor in connection with lines not upon its right of way, and the Telegraph Co. should connect the "exclusive railroad wires" with additional offices, stations, and buildings of the Railroad in the cities and towns along its route, and also in the cities of New York and Brooklyn, where the Telegraph Co. had facilities therefor, and if the Telegraph Co. should have underground conduits available for reaching the Railroad's offices, stations, and buildings, the Telegraph Co. should furnish the Railroad such connecting wires as it might be able to supply in said conduits upon payment by the Railroad of the entire cost of the wire and of placing the same in the conduits and the pro rata cost of construction or rental and maintenance of the conduits.

(6) The Telegraph Co. should furnish free of cost the use of its main batteries for the efficient operation of all railroad wires and also all instruments, stationery, and other material for commercial business, and should grant to the Railroad for use upon the railroad wires the free use of all telegraphic patents then or thereafter owned or used by the Telegraph Co. or its subordinate companies, for the general telegraph business, except that any payments which the Telegraph Co. might be required to make on account of such free use to any minority interests in subordinate companies should be charged to the Railroad, and the Railroad should furnish all instruments, stationery, and other material for railroad business.

(7) The railroad wires should be used only by the Railroad for its railroad business and should not be used for the transmission of any commercial or public telegraph business for tolls, except that where there was but one wire it might be used jointly by the Telegraph Co. with the Railroad, important railroad messages directing the movement of trains having precedence, until such time as in the judgment of the president of the Railroad such joint use might be detrimental to the business of the Railroad, whereupon the Telegraph Co. should erect an additional wire for commercial business; that in all other cases the railroad wires might be used from time to time by the Telegraph Co. jointly with the Railroad, with the Railroad's assent, when not in use for railroad business; that whenever the railroad wires should become disabled the Railroad should have the right to take and use jointly with the Telegraph Co. any of the working commercial wires for the purpose of moving its trains or transacting other important and urgent railroad business, such use to continue without cost to the Railroad until the repair of the railroad wires had been effected and the circuits restored, but that the through commercial wires or circuits should not be subject to such use by the Railroad except in cases of extreme emergency.

(8) Either party might establish and maintain telegraph stations at such places on said railroads as it might deem necessary; at all telegraph stations of the Railroad it should furnish operators at its own expense; its operators and other employés acting as agents of the Telegraph Co. should receive, trans-

mit, and deliver exclusively for the Telegraph Co. such commercial or public messages as might be offered and should charge the tariff rates of the Telegraph Co. thereon, and should render to the Telegraph Co. exclusively monthly statements of such business and full accounts of all receipts therefrom, and pay all of such receipts to the Telegraph Co., but in the transaction of all such telegraph business said operators and all other employés should be held to be only the agents of the Telegraph Co. and should conform to all rules and regulations of the Telegraph Co. applicable to all telegraph business, whether paid or free, and should not, without the consent of the Telegraph Co., transmit over the lines covered by said contract, any free messages except those therein provided for. Whenever the number of paid and collect messages sent from any railroad office should amount to $3,000 or more in any one year, the Telegraph Co. should thereafter provide an operator for such office so long as said messages amounted to said number, and said operator, acting as the agent of the Railroad, should attend to the telegraph business of the Railroad without charge so long as one operator could attend to the telegraph business of both parties. No employé of the Railroad should while in its service be employed in the transaction of commercial or public telegraph business for any party other than the Telegraph Co., and the Telegraph Co. should have the exclusive right to the occupancy of the Railroad's depots and station houses for commercial or telegraph business as against any other party.

(9) If the Telegraph Co. should elect to establish an office in a station building of the Railroad, the latter should, if convenient, provide office room therein and light and fuel therefor, free of charge, and if at such station one person could attend to the telegraph business of both companies, the operator of the Telegraph Co. at such office, acting as agent for the Railroad, should attend to the telegraph business of the Railroad without charge and conform to the rules of the Railroad applicable thereto. Whenever the telegraph business of both companies at any office where the Telegraph Co. furnished the operator should become so large as to require more than one operator, the Railroad should employ and pay its own operator.

(10) The Telegraph Co. should receive and transmit from said lines along said railroads, and should deliver free of charge the messages of the officers and agents of the Railroad pertaining to its railroad business, between all places then reached by said telegraph lines on said railroads. Such messages should be received at and delivered from any of the offices of the Telegraph Co. or its subordinate companies in any of said places, and, when so received, should be transmitted by the Telegraph Co. over said telegraph lines free of charge. The Telegraph Co. should issue to officers of the Railroad annual franks authorizing the free transmission of messages relating strictly to railroad business of the Railroad originating at and destined to points on the lines then or thereafter owned or operated by the Telegraph Co. or its subordinate companies in the Telegraph Co.'s general telegraph system beyond or off the lines of said railroads, to an amount not exceeding $10,000 per annum, calculated at the regular day rates of the Telegraph Co. between the points at which said messages should originate and the points to which they might be destined. The Railroad should pay to the Telegraph Co. one-half of its aforesaid rates on all such messages in excess of said amount, settlements to be made yearly. The free telegraphic service provided for in said contract should apply only to the transmission of messages concerning the operation and business of the Railroad's railroads covered by said contract, and should not be extended to any messages for transmission by cable, nor to messages ordering steamer berths, merchandise, or accommodations for customers of the Railroad, the tolls on which messages should properly be chargeable to such customers.

(11) The Railroad should transport free of charge over its railroads, on application of the Telegraph Co., all employés of the latter when traveling on its business or engaged in its work along said railroads, and transport and distribute free of charge all poles and other material and supplies of the Telegraph Co. for the construction, maintenance, renewal, and reconstruction of said telegraph lines covered by said contract, along said railroads, and also all material and supplies for the establishment, maintenance, and operation of the offices of both parties to said contract upon said telegraph lines at places

along said railroads; that the Railroad should transport free of charge the employés of the Telegraph Co. when traveling on its business or engaged in its work, and the materials and supplies of the Telegraph Co. required for the construction, maintenance, renewals, and reconstruction of other telegraph lines of the Telegraph Co. other than those above referred to, whether on or off the lines of said railroads, to an amount not exceeding $10.000 per annum, calculated at the current transportation rates of the railroad, and the Telegraph Co. should pay to the Railroad one-half of its aforesaid rates on all such transportation of employés and material in excess of said amount, settlements to be made yearly.

(12) The Telegraph Co. should pay to the Railroad the sum of $60,000 per annum, in equal installments of $5,000 at the close of each month during the continuance of the contract, accounting from October 15, 1887.

(13) The Railroad should not be responsible for and the Telegraph Co. should indemnify it against any loss or damages of any kind arising from any injury to persons in the employ of or property belonging to the Telegraph Co. while being carried free or at half rates over said railroads under said contract, and should likewise indemnify the Railroad from any neglect or failure in the transmission or delivery of messages for any person doing business with the Telegraph Co. and on account of any other public telegraph business, and the Telegraph Co. should not be responsible for and the Railroad should indemnify against any loss or damages of any kind arising from or on account of any error or default in the transmission or delivery of any and all messages sent for the Railroad under said contract.   *   *   *

(15) The provisions of said contract should apply to any new extensions or branches built or other railroads acquired by the Railroad, and to the telegraph lines thereon, to the same extent as if such lines and railroads had been originally included in said contract, and, if there should be no telegraph line on any such roads, then the Telegraph Co. should furnish material and construct one thereon and maintain, repair, and reconstruct the same, the Railroad furnishing the unskilled labor therefor. The Telegraph Co. should set apart on any such railroads, for the Railroad's business, one exclusive railroad wire. If the Railroad should acquire a telegraph line on any such road, the Railroad should sell and the Telegraph Co. should purchase such telegraph line on a valuation to be agreed upon. Upon all such extensions, branches, and leased, controlled, or thereafter acquired roads, the Railroad should be entitled to free telegraphic service to the same extent and in the same manner as provided by the first clause of paragraph 10 of the contract on the railroads· originally covered by said contract, and the $10,000 per year limit of free telegraphic service, as provided by the second clause of paragraph 10, should be increased $6 per annum for each mile of such road occupied by the Telegraph Co.'s lines upon such extensions, branches, leased, controlled, or thereafter acquired roads. The Telegraph Co. should be entitled to free transportation service for employés and material to the same extent, for use thereon and in the same manner as provided by the first clause of paragraph 11 of said contract, and the $10,000 per annum limit for free transportation provided for by the second clause of said paragraph 11 should be increased $6 per annum per mile of such road occupied as aforesaid.

(16) The Railroad granted and agreed to assure to the Telegraph Co. the exclusive right of way, on, along, and under the lands, roads, and bridges of the Railroad, and any extensions and branches and any leased, operated, or controlled roads and the full and exclusive use and enjoyment thereof, for the construction, maintenance, operation, and use of lines of poles and wires and underground or other lines for commercial or public uses or business. The Railroad would clear and keep clear said right of way of obstructions to the construction and maintenance of the lines and wires provided for in said contract. The Railroad would not transport men or material for the construction, maintenance, or operation of a line of poles and wire or wires or underground or any telegraph or telephone line in competition with the lines or business of the Telegraph Co. except for the Railroad's current legal rates, nor would it furnish for any competing line any facilities or assistance that it might lawfully withhold, nor stop its trains nor distribute its material there-

for at other than regular stations, so far as such refusal and limitation of transportation might be lawful, but that the Railroad should not be required to furnish unskilled labor for the construction, maintenance, removal, or reconstruction of any other than the telegraph lines then existing and renewals thereof, upon said railroads and the additional wires that might be placed thereon and the lines provided for on extensions, branches, and acquired roads. * * *

(18) The telegraph lines covered by said contract should form part of the general telegraphic system of the Telegraph Co. and be controlled and regulated by it, and it should fix and determine all tariffs for the transmission of messages and of connections with other lines and interests. No wire then or thereafter owned, leased, controlled, or used by the Railroad should at any time be used or employed directly or indirectly in competition with the Telegraph Co. by or for any party other than the Railroad and the Telegraph Co., and the Railroad should not at any time during the continuance of the contract engage in or transact any commercial or public telegraph business excepting for the Telegraph Co. under the provisions of the contract.

(19) The management and control of the railroad employés, so far as engaged in telegraphic duties upon said railroads, and of the employés of the Telegraph Co. engaged in the maintenance, repair, renewal, and reconstruction of said telegraph lines along said railroads and the transportation of men, material, and supplies therefor, should be vested in a competent joint superintendent of telegraph, who should be appointed and whose salary should be fixed by the Railroad, with the approval of the Telegraph Co., which salary should be paid equally by the Railroad and the Telegraph Co.; that said joint superintendent should be removable for cause by either party and should be subordinate to and under the control of the Telegraph Co. so far as necessary to enforce its rules, regarding the maintenance, repair, renewal or reconstruction, operation, management, and arrangement of its lines, and the transaction of the commercial telegraph business upon said railroads. Said joint superintendent should also be subordinate to and under the control of the Railroad so far as necessary to enforce its rules, regarding the maintenance, management, and operation of its exclusive railroad wires, and that he should co-operate with both parties in giving the utmost efficiency to the working of all lines upon said railroads and the proper transaction of the railroad and commercial telegraph business thereon, and that the Railroad should furnish office room and light and fuel therefor for said joint superintendent and that each party should supply the clerical force for its own business.

(20) * * *

(21) Said contract should terminate all previous agreements between the parties, should continue in force for 50 years from October 15, 1887, and might be renewed after the expiration of such term for further terms of 50 years each by either party giving written notice to the other to that effect at least 6 months prior to the expiration of the preceding period, and a violation of any of the provisions of the agreement by either party, while entitling the other to a claim for damages and the usual remedies for specific enforcement, should not be held to void the agreement or to abrogate the obligations or the undertakings of either party thereto.

The so-called Hepburn Act approved June 29, 1906, c. 3591, § 2, 34 Stat. 586, amended section 6 of the "Act to regulate commerce" of February 4, 1887 (chapter 104, 24 Stat. 380 [Comp. St. 1913, § 8569]), familiarly called the Interstate Commerce Act, so as to provide, among other things: "Nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time."

On December 21, 1906, the Interstate Commerce Commission announced its report "In the Matter of Railroad-Telegraph Contracts" (12 Interst. Com. Com'n R. p. 10), in which it affirmed and construed its previous rulings of

September 5 and October 12, 1906, and stated, among other things, that: "The commission knows of no provision in law now in force which vests it with any authority, or any clause in the law that affords it a reasonable ground to differentiate 'off the line' service by carriers for telegraph companies from the transportation of merchandise or any other form of property for private shippers."

The commission further held that contracts with telegraph companies could be lawfully entered into so far as they affect "on line" service.

On June 3, 1907, the commission announced its administrative ruling No. 219, in which it referred to and amplified its previous rulings in respect of the subject-matter here under consideration. On November 15, 1907, the commission announced that its ruling No. 219 applied to telephone service and called upon carriers that had not already done so, to file with the commission copies of all contracts for telegraph or telephone service on their lines, and, as a result, all of the contracts then existing between the railroad companies and the telegraph companies throughout the United States for the exchange of services were thereupon filed with the commission and have since remained on file. In view of the ruling of September 15, 1906, the plaintiff, on October 1, 1906, informed the defendant that it would not further perform the contract so far as it affected "off line" services, and in 1908 defendant filed a bill against plaintiff in the United States Circuit Court for the District of Maryland, praying that a decree might pass adjudging the contract to be in full force and effect and that the railroad specifically perform the same. An answer was duly interposed, and by leave of the court the Interstate Commerce Commission, through its solicitor, submitted and filed a brief as amicus curiæ, and argument was heard by the court. Before the court rendered any decision, the Congress enacted an act approved June 18, 1910, entitled "An act to create a Commerce Court and to amend the act entitled 'An act to regulate commerce' approved February 4, 1887, as heretofore amended, and for other purposes," which extended the provisions of the Interstate Commerce Act to telegraph, telephone, and cable companies, and amended section 1 of the Interstate Commerce Act so that it contained, among other provisions, the following (the additions being underlined):

"All charges made for any service rendered or to be rendered in the transportation of passengers or property *and for the transmission of messages by telegraph, telephone, or cable, as aforesaid,* or in connection therewith, shall be just and reasonable; and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful: *Provided, that messages by telegraph, telephone, or cable, subject to the provisions of this act, may be classified into day, night, repeated, unrepeated, letter, commercial, press, government, and such other classes as are just and reasonable, and different rates may be charged for the different classes of messages: And provided, further, that nothing in this act shall be construed to prevent telephone, telegraph, and cable companies from entering into contracts with common carriers, for the exchange of services.* * * *

"No common carrier subject to the provisions of this act shall, after January first, nineteen hundred and seven, directly or indirectly, issue or give any interstate free tickets, free pass, or free transportation for passengers, except to its employés: * * * *Provided,* that this provision shall not be construed to prohibit the interchange of passes for the officers, agents, and employés of common carriers, and their families; nor to prohibit any common carrier from carrying passengers free with the object of providing relief in cases of general epidemic, pestilence, or other calamitous visitation: *And provided further, that this provision shall not be construed to prohibit the privilege of passes or franks, or the exchange thereof with each other, for the officers, agents, employés, and their families of such telegraph, telephone, and cable lines, and the officers, agents, employés and their families of other common carriers subject to the provisions of this act.*"

After the act became law, the parties, acting on the belief that the intent of the statute was to permit the continued performance by them of all the obligations under the contract, consented to the withdrawal of the suit in

Maryland, and the court permitted such withdrawal. The parties thereupon proceeded to carry out the contract in accordance with its terms until about April 25, 1916, when defendant refused to perform the provisions of the contract in respect of "off line" services, in view of a conference ruling of the Interstate Commerce Commission dated March 28, 1916, and plaintiff was notified by defendant that it would continue to carry out its contract in such regard only in the manner indicated by such ruling. This ruling was as follows:

"Upon inquiry as to whether or not under the provision of section 1, 'That nothing in this act shall be construed to prevent telephone, telegraph and cable companies from entering into contracts with common carriers, for the exchange of services,' a railroad may contract with a telegraph company (including in that term 'telephone, telegraph and cable companies') to transport the property of such telegraph company, whether for use on the line of said railroad or merely to be transported over such line for use elsewhere, at a different rate from that applicable to such transportation under section 6 of the act, held, that while said carriers may contract for an exchange of services, such services must be exchanged upon the basis of the lawful rates of said railroad, as published and filed in accordance with the provisions of section 6 of the act, and of the reasonable charges of said telegraph company, regularly charged other customers for similar services; except that said carriers may contract, without reference to said lawful rates and charges, for the transportation by said railroad for said telegraph company of the property of the latter over the line of the former when such property is to be used along the line of said railroad and in the construction, improvement, or operation of said railroad, that is to say, when such transportation is not conducted by said railroad as a common carrier."

The answer of defendant in the suit at bar admits the allegations of the complaint, alleges the facts as to the extent of defendant's telegraph system, and further sets forth that defendant, in view of certain rulings of the Interstate Commerce Commission and of the many and severe penalties which would attach should it do otherwise, and should such rulings be held to express the correct interpretation of the statute, felt compelled to refuse performance in the particulars named in the complaint although otherwise willing to carry out such contract in accordance with its terms. When the cause came on for hearing, it was suggested by counsel that the Interstate Commerce Commission should be invited to participate, through its solicitor, as amicus curiæ, and, this suggestion having been approved by the court, an invitation accordingly was extended by the court to the Interstate Commerce Commission, and that invitation was promptly and courteously accepted, with the result that a brief has been filed on behalf of the Interstate Commerce Commission, and counsel, upon its behalf, has also participated in the argument; the understanding being that defendant will appeal if so advised and requested by the Interstate Commerce Commission.

J. Du Pratt White, George F. Brownell, and Vermont Hatch, all of New York City, for plaintiff.

Rush Taggart, of New York City, for defendant.

Joseph W. Folk and Otis B. Kent, both of Washington, D. C., amici curiæ, for Interstate Commerce Commission.

MAYER, District Judge (after stating the facts as above). [1] The complaint sets up a cause of equity under the authority of such cases as Bank of Kentucky v. Stone et al. (C. C.) 88 Fed. 383, and United States Life Ins. Co. v. Cable, 98 Fed. 761, 39 C. C. A. 264.

[2] The question here under consideration is the meaning of the expression "the exchange of services" as found in the act approved on June 18, 1910.

The contract between these parties is typical of contracts between railroad companies and the Telegraph Co. throughout the United

States, and the importance of the question may be realized when it is stated that the telegraph lines operated and controlled by defendant comprise over 200,000 miles of poles and cables and over 1,000,000 miles of wire, that defendant has nearly 25,000 offices, about 20,000 of which are railroad offices, yielding revenues too small to pay for maintenance separate and apart from the advantage derived from contracts with the railroad companies, and that a very large part of defendant's system is constructed in accordance with approximately 1,300 contracts with approximately 300 different railroads and railroad systems; all such contracts being similar in their underlying provisions with that between the parties to this suit.

Whether the meaning of the "exchange of services" is determined by (a) the narrow test of verbal literalism, or (b) the broader rule of ascertaining the intention of the Congress "from the language used in the act and  *  *  *  by a resort to the history of the times when it was passed" (United States v. Trans-Missouri Freight Association, 166 U. S. 290, 318, 17 Sup. Ct. 540, 41 L. Ed. 1007), the result is the same.

(a) "Exchange" has a well-settled meaning in common acceptation. Webster's definition is:

"The act of giving or taking one thing for another which is regarded as an equivalent; as an exchange of cattle for grain."

But, while the trader may, for purposes of his own calculation, put his own value on his cattle or his grain, the transaction as between the parties is not measured in money. The owner of the cattle wants grain, while the owner of the grain wants cattle, and each is satisfied to exchange the thing for the thing, instead of agreeing that the market value of the cattle is so much per head and the market value of the grain so much per bushel and exchanging on the exact basis of multiplying the unit by the number of heads or the number of bushels intended to be transferred one to the other.

This popular meaning of "exchange" used and understood in the common speech of people has been accepted and defined by Codes and courts. No more apt nor concise definition can be found than that in the Civil Code of Louisiana (article 2660):

"Exchange is a contract, by which the parties to the contract give one to the other, one thing for another, whatever it be, except money; for in that case it would be a sale."

See, also, Civil Codes of California, § 1804, North Dakota, § 6003, South Dakota, § 1348, and Montana, § 5129. And the courts in one form of phraseology or another seem to have uniformly followed the definition of exchange given by Judge Story in Buffum v. Merry, 4 Fed. Cas. 605:

"What is a sale or exchange? Blackstone says it is a transmutation of property from one man to another in consideration of some price or recompense in value. If it be a commutation of goods for goods, it is more properly an exchange." Elwell v. Chamberlin, 31 N. Y. 611, 624; Cooper v. State, 37 Ark. 412, 418; Chapman v. Hughes, 134 Cal. 641, 657, 58 Pac. 298, 60 Pac. 974, 60 Pac. 982; Forkner v. State, 95 Ind. 406; Edwards & Beardsley v. Cottrell & Babcock, 43 Iowa, 194; Laharee v. Klosterman, 33 Neb. 150, 49 N. W. 1102. Vail v. Strong, 10 Vt. 457, 467; Long v. Fuller, 21 Wis. 121, 124.

"Exchange of services," therefore, clearly refers to the kind of services which the Railroad can render to the Telegraph Co., and vice versa, in connection with the business of transmitting intelligence by telegraph for the Railroad or of transporting men and material for the Telegraph Co., as the case may be. To say that the exchange must be on the basis of the lawful tariff rates of the Railroad and of the reasonable charges of the Telegraph Co., regularly charged other customers for similar services, is but another way of asserting that the proviso of the statute is without meaning. A statute was not necessary to figure out the service in this way, for such a method merely means that the Railroad in return for $100 worth of transportation at lawful rates may be paid by $100 worth of telegraph transmission charged at the reasonable and nondiscriminatory rates secured by the statute—all of which could be done without the or any proviso, as a mere matter of bookkeeping. And, if it was intended that upon such a method of calculation any excess of services by the Railroad over the services of the Telegraph Co., or vice versa, should be paid for by virtue of the statute, then the Railroad and the Telegraph Co. were placed in no different relation with each other than they were with any one else, and hence the proviso was meaningless and useless—a conclusion always avoided in construing a statute.

The views stated supra lead to the same result (although arrived at on a different theory) as the commission applied to "on line" service in its conference ruling of March 28, 1916. In that ruling, the commission sought to distinguish between "on line" and "off line" service, and such is now the position of its counsel. The argument is thus stated:

"Where a railroad company transports free or at reduced rates the men or material of a telegraph company engaged or to be used in the construction of telegraph facilities along the lines of the railroad, it is performing for the shipper a service so closely analogous to the transportation of its own employés and property as not to transcend the spirit of the act. So, also, where a telegraph company transmits the messages of a railroad company between points along the lines of the railroad, it is performing a service which the railroad, but for the contract of exchange, would have to perform for itself, and the performance of such services by the telegraph company free or at reduced rates is not in contravention of the statute. * * *

"Where a railroad company, however, transports the men or material of a telegraph company for the construction or maintenance of service off the lines of the railroad, or where the telegraph company transmits the messages of the railroad to or from points off its lines, each company is performing for the other a service practically identical with the service which each respectively renders for the public. For either of such carriers to render such services at other than the regularly published rates and reasonable charges prescribed in the act would be to discriminate against other shippers, passengers, and senders of telegrams not so favored."

But there is nothing in the statute nor in its "spirit" which justifies this distinction. The Congress by appropriate and concise language could have differentiated between "on line" and "off line" services. On the contrary, however, its words "the exchange of services" were of the broadest character and without limitation as to whether the "services" were "on line" or "off line"; and it is significant that in a statute bringing in telegraph, telephone, and cable companies for the first time and having as one of its important features the safeguard-

ing of the public against discrimination, so pronounced an exception should be made without qualifications of any kind, in respect of contracts with common carriers, "for the exchange of services."

(b) Where, in addition to the language of the statute, considered by itself, the intention of the Congress is sought in the light of relevant history, the construction already indicated is amply confirmed.

. As counsel for defendant said in the suit in Maryland between these same parties:

"The railroad and the telegraph are the Siamese Twins of commerce, born at the same period of time, developed side by side, united by necessity; and * * * what the laws of trade and usage have thus joined together it could not have been the purpose of Congress to put asunder. * * * "

Since the middle of the last century, the railroads and the telegraph company entered into the relations illustrated by the contract here under consideration, and, as in this case, these contracts have been renewed from time to time, their duration being for long periods of years, all looking to the establishment of a settled status and modus vivendi by virtue of the very nature of the contract and the business and operating relations of the parties.

At the outset, it is apparent that the contract contains important provisions so interwoven and so interdependent that it must be regarded as an entire contract. Obviously, such a contract is entered into only after the most careful consideration, involving an understanding of the practical and financial results to each of the parties. The provisions as to rights of way, joint superintendency, and the like, and the value of the services each to the other, including, among other things, the payment by the Telegraph Co. to the Railroad of $60,000 per annum, all demonstrate that the exchange of railroad service as such for telegraph·service as such, rests on the other mutual obligations secured by the contract. That this was known and appreciated by the commission appears fully from its rulings. With its knowledge, based upon comprehensive experience in regard to and understanding of administrative features and effects, the commission clearly indicated that its rulings were based solely on· its interpretation of the statutes, and not upon any detrimental results which would follow from the interpretation contended for by the railroads and the telegraph companies.

In its Twenty-First Annual Report to the Congress dated December 23, 1907, the commission referred to its rulings made up to that time and stated its views in the language of·its ruling of December, 1906, a significant part of which was:

"Contracts between telegraph companies and carriers for the maintenance of telegraph lines on the rights of way of railroads are sui generis and unlike any other contracts with carriers that have come to our attention. So far as we can now see, the full performance of such contracts by the carriers with whom they are made would not affect any public or private interest adversely."

In its Twenty-Second Annual Report to the Congress dated December 24, 1908, the commission again referred to its rulings and reports· in respect of this subject-matter.

The Annual Report of 1909 made no reference to the subject-matter, and, although dated December 21, 1909, there is nothing to show when

or if it was laid before the Sixty-First Congress which reconvened January 4, 1910, and adjourned sine die June 25, 1910.

The Sixtieth Congress was not in session at the date of the 1908 report, and, as it held a session of only two months in the winter of 1909, it probably had no opportunity to consider the report of 1908.

It may, however, fairly be assumed that the Sixty-First Congress gave consideration to the reports of 1907 and 1908 from the administrative body peculiarly equipped to inform it in respect of matters coming under its (the commission's) observation. Aldridge v. Williams, 3 How. 9, 11 L. Ed. 469; United States v. Union Pacific R. R. Co., 91 U. S. 72, 79, 23 L. Ed. 224; United States v. Trans-Missouri Freight Association, supra.

The bill creating the Commerce Court in which the amendment of 1910 was incorporated was an elaborate measure, and the proviso here considered could not have been evolved from inner consciousness nor suddenly have been flashed from a clear sky.

Resort to the commission's reports and to the contracts on file then showed, as it does now, that the commission apparently reluctantly had made a sort of divided ruling going as far as it felt it could in preserving the integrity of these contracts and going no further only because of its interpretation of the applicable statutes, but contemporaneously announcing most affirmatively that the full performance of the contracts would not affect any public or private interest adversely. Further, this ruling was not accepted nor acquiesced in, and, in the absence of clear and explicit language, it seems idle to contend that the Congress was merely incorporating the rulings of the commission in the statute distinguishing between "on line" and "off line" services when inter alia, under its jurisdiction as to carriers, the commission had already recognized the lawful character of the contracts as affecting "on line" services and, when the Congress, almost by virtue of lay knowledge, must have appreciated that "off line" service may be as vital to telegraph or railroad operation "on line" as "on line" service.

Thus, if a bridge has been swept away at A, on the line of the railroad, is it any less vital to telegraph that intelligence to a connecting carrier at B off the line, than to the railroad's agent at C on the line? or if a telegraph wire has been destroyed at A at a point one yard off the line, is it any less vital for the railroad to transport men and material to replace the destroyed wire than to do the same transportation to replace the same destroyed wire at B on the line, one yard this side of A? That the courts will not take so narrow or differentiated a view of the statute as to answer these questions in the affirmative has already been indicated by United States v. Erie Railroad, 235 U. S. 513, 35 Sup. Ct. 193, 59 L. Ed. 335, and United States v. Erie Railroad, 236 U. S. 259, 35 Sup. Ct. 396, 59 L. Ed. 567.

[3] In addition to these considerations, it is further fair to assume that the Congress had knowledge of the necessarily intimate relation between the railroads and the telegraph companies as shown by its own acts and the decisions of courts. Pacific Railroad Act of July 1, 1862, c. 120, 12 Stat. at Large, 489; Texas & Pacific Incorporation Act of March 3, 1871, c. 122, 16 Stat. at Large, 573; Indian Reser-

vation Railroad Act of 1899, c. 374, 30 Stat. at Large, 990 (Comp. St. 1913, §§ 4181–4188); Enid, etc., Railroad Act of 1902, c. 134, 32 Stat. at Large, 43; United States v. Union Pacific Ry. Co., 160 U. S. 1, 16 Sup. Ct. 190, 40 L. Ed. 319; St. Paul, M. & M. Ry. Co. v. Western Union Telegraph Co., 118 Fed. 497, 55 C. C. A. 263; United States v. Northern Pacific R. R. Co. (C. C.) 120 Fed. 546; Western Union Telegraph Co. v. Pa. R. R. Co., 195 U. S. 540, 25 Sup. Ct. 133, 49 L. Ed. 312, 1 Ann. Cas. 517; Western Union Telegraph Co. v. Pa. R. R. Co., 129 Fed. 849, 64 C. C. A. 285, 68 L. R. A. 968.

It is unnecessary to elaborate further upon additional facts and arguments advanced by the parties in support of the contention that the conference ruling of March 28, 1916, cannot be sustained. But there are some significant observations in the opinion of Mr. Justice McKenna in United States v. Erie Railroad, 236 U. S. 259, 35 Sup. Ct. 396, 59 L. Ed. 567, which are here serviceable.

First. As concisely stated in the headnote, a ruling of the Interstate Commission which was never enforced—the custom of the carriers being uniformly the other way—cannot have the weight ordinarily accorded to the contemporaneous construction of a statute by the officers upon whom is imposed the duty of administering it.

Second. Analogously with the observation as to the interchange of passes that the Congress considered "that the best safeguard against its abuse was the interest of the carriers," and that the exercise of the right "has its justification in a strictly business policy, and, instead of being a burden upon the resources of the companies it is an aid to them," it may be similarly said here that the exchange of services, whether viewed in its comprehensive aspect or merely as an exchange of telegraph service as such for railroad service as such, is based on business policies providently entered upon and safeguarded by self-interest, and so the Congress must have realized. The contracts do not provide for "free" services in the true sense. They are not within the evil which evoked remedies against practices such as are discussed in Louisville & Nashville R. R. Co. v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671, and Chi. Ind. & L. Ry. Co. v. United States, 219 U. S. 486, 31 Sup. Ct. 272, 55 L. Ed. 305, but they are, indeed, sui generis, entitled in the interest both of the public and the parties to be completely performed in accordance with their provisions and in accordance with what seems undoubtedly to have been the intent of the statute.

It follows that plaintiff may have a decree as prayed for.

Settle decree on notice to all counsel who participated in the argument.