CHICAGO GREAT WESTERN R. CO. v. POSTAL TELEGRAPH-CABLE CO.

(District Court, N. D. Illinois, E. D.. August 14, 1917.)

No. 735.

1. CARRIERS ⚖️32(2)—TELEGRAPHS AND TELEPHONES ⚖️34—CHARGES—DISCRIMINATION.

Commerce Act Feb. 4, 1887, c. 104, § 6, 24 Stat. 380 as amended by Act June 29, 1906, c. 3591, § 2, 34 Stat. 586 (Comp. St. 1916, § 8569), provides that no carrier, unless otherwise provided, shall engage in the transportation of passengers or property unless its charges have been filed and published, nor shall any carrier charge, demand, collect, or receive a greater, less, or different compensation than the charges specified in the tariff filed. Act June 18, 1910, c. 309, 36 Stat. 539, amending the Commerce Act, provides that its provisions shall apply to telegraph and telephone companies, that all charges for the transmission of messages by telegraph or telephone shall be just and reasonable, and that every unjust and unreasonable charge is thereby prohibited, provided that nothing therein shall prevent telegraph and telephone companies from contracting with common carriers for the exchange of services. *Held*, that the act of 1910 does not authorize a railway company and a telegraph company, contracting for an exchange of services to render "off-line" service, such as the transportation of material or supplies destined for points beyond the railway company's lines, or the transmission of messages to points beyond the carrier's lines, at a rate other than that published in the regular schedules, and different from the rate charged the general public.

2. CARRIERS ⚖️23—TELEGRAPHS AND TELEPHONES ⚖️34—DISCRIMINATION—STATUTORY PROVISIONS.

A contract between a telegraph company and a railway company for the rendition of "off-line" services for less than the rates published and charged the general public, though valid when made prior to the amendment of Commerce Act by Act June 29, 1906, c. 3591, is prohibited thereby.

3. STATUTES ⚖️219—EXECUTIVE CONSTRUCTION—WEIGHT.

The conference rulings of the Interstate Commerce Commission respecting the construction of statutes regulating commerce, though not conclusive, are entitled to great weight, and should not be lightly overruled.

---

⚖️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the Chicago Great Western Railroad Company against the Postal Telegraph-Cable Company. Bill dismissed.

Winston, Payne, Strawn & Shaw, of Chicago, Ill., for plaintiff.
Jacob E. Dittus, of Chicago, Ill., for defendant.

EVANS, Acting District Judge. Plaintiff in this suit seeks to compel defendant to comply with the terms of a certain contract made December 26, 1888, between the defendant and plaintiff's predecessor, and to restrain the prosecution of certain actions instituted by defendant to collect moneys alleged to be due for services rendered plaintiff by defendant. Sufficient allegations appear in the bill and are admitted in the answer and were conceded upon the trial to give a court of equity jurisdiction of the cause. In other words, it is conceded that, if the contract be upheld, the decree must be for the plaintiff.

The contract under consideration provided generally for the rendition of service by the parties to this action to each other and was to continue for 99 years from its date. The substance of a very similar contract is set forth at some length in the opinion of the court in deciding the case of Baltimore & Ohio Railroad Co. v. Western Union Telegraph Co. (D. C.) 241 Fed. 162. Only a few of the more important paragraphs will be quoted. Paragraphs 2, 3, 7, and 8 read as follows:

"2. The railway company agrees to furnish all labor necessary for the maintenance, repairs, and renewals of said telegraph lines, and for any extensions thereto that may hereafter be made upon property that is now or may hereafter be owned or controlled by the railway company, and to furnish office room in its railway stations, and that its railway telegraph operators shall handle the business of the telegraph company at all stations along the line of said railway, except at such places as the telegraph company may establish a separate office for the better accommodation of the telegraph business of such places. It is understood and agreed, however, that, whenever the commercial or public business at any office maintained by the railway company shall become greater than can be properly carried on by the operator or operators employed by the railway company, then the telegraph company shall furnish and pay for its own operating service at such office. And it is agreed that the employés of the railway company, in the performance of their duties in connection with the maintenance and operation of said telegraph lines, shall observe the rules and regulations of the telegraph company applicable thereto, and shall exercise the same care and diligence in the maintenance and repair of the wire or wires that the telegraph company has or may have along said railway for its business, and in the transaction of the commercial telegraph business, as in the maintenance and repair of the wire or wires of the railway company, and in the transaction of the telegraph business of the railway company.

"3. The railway company agrees to transport free of charge over its railway, upon application of the superintendent or other officer of the telegraph company, employés of the telegraph company, when traveling upon the business of said company, and also to transport and distribute free of charge along the line of its railway all poles or other material and supplies for the construction, maintenance, renewal, repair, and operation of the lines and wires covered by this agreement, and of such additional lines of poles and wires as may be erected under the provisions of this agreement, and also of material and supplies for the establishment, maintenance, and operation of the offices of both parties hereto at places along and adjacent to said railway."

"7. The telegraph company agrees to transmit free, over its lines beyond

245 F.—38

said railway telegraph lines, business of the railway company to the extent of $10 per mile of railway per annum, including any extensions that may hereafter be made of said railway, such business being charged at the regular rates of the telegraph company, and for this purpose the telegraph company will issue to said officers of the railway company as may be designated by the president, vice president, or general manager thereof, annual franks of the telegraph company, authorizing such free transmission of messages relating strictly to the railway or corporate business of the railway company, originating at or destined to points on the telegraph company's line within the United States, either upon or off the line of said railway; and in case the telegraph business of the railway company beyond its lines shall amount to more than $10 per mile of railway per annum, the excess shall be paid for at one-half the regular rates of the telegraph company. It is understood and agreed, however, that the telegraph service herein provided for applies only to the transmission of messages concerning business of the railway company, and shall not be extended to messages for transmission by ocean cable, nor to messages ordering sleeping car, parlor car, or steamer berths, or other accommodations for customers of the railway company, the tolls upon which should properly be chargeable to such customers.

"8. It is mutually understood and agreed that the business of the railway company shall have precedence over all other business upon the wires set apart for the use of the railway company, and that the railway company shall have the full use of all the wires now in operation, and of two wires upon any extensions of said railway that may hereafter be made in case the railway company require the same, free of charge, but that until the railway company shall find it necessary to have the sole use of said wires the commercial business of the telegraph company shall also be done over the said wires. In case the railway company shall require the use of an additional wire or wires for railway business over and above the two wires hereinbefore mentioned, the same shall be paid for by the railway company, and in case an additional wire or wires shall be required for commercial business, the same shall be paid for by the telegraph company, and in either case such additional wire or wires shall come in under the terms of this contract as to maintenance, repairs, and renewals. In case the two wires, or either of them, set apart for the use of the railway company, shall be at any time unfit for use, the railway company shall have the free use of such of the wires set apart for commercial business as shall be necessary to transact its business until the wires set apart to it shall be put in fit condition for use."

[1] Defendant's counsel attempts to make a distinction between what is termed "on-line" service and "off-line" service. When the railroad transports material or supplies for use on its own right of way, the service is described as "on-line" service. When the carrier transports material or supplies over its road to be used in constructing or repairing the telegraph company's lines beyond the carrier's lines, it is "off-line" service. Likewise the telegraph company conveys messages for the railroad company along the common line of the two companies, and in doing so renders what it calls "on-line" service. When the same company conveys messages to points beyond the lines of the carrier, the service is said to be "off-line" service. Defendant assails the present validity of that portion of the contract that calls for the rendition of "off-line" service at other than regular rates.

The precise question is this: Under the laws as they exist to-day, can a carrier or telegraph company render "off-line" service to the other at a rate other than that published in the regular schedules and different from the rate charged the general public?

Plaintiff answers this question in the affirmative, and for its authority relies upon an act of Congress enacted June 18, 1910, generally

referred to as an amendment to the Interstate Commerce Act. The material portion of the act relied upon reads as follows:

"Section 1. That the provisions of this act shall apply to any corporation or any person or persons engaged in the transportation of oil or other commodity, except water and except natural or artificial gas, by means of pipe lines or partly by pipe lines and partly by railroad or partly by pipe lines and partly by water, and to telegraph, telephone, and cable companies (whether wire or wireless) engaged in sending messages from one state, territory, or District of the United States, to any other state, territory, or District of the United States, or to any foreign country, who shall be considered and held to be common carriers within the meaning and purpose of this act, and to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad. * * * All charges made for any service rendered or to be rendered in the transportation of passengers or property and for the transmission of messages by telegraph, telephone, or cable, as aforesaid, or in connection therewith, shall be just and reasonable; and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful: Provided, that messages by telegraph, telephone, or cable, subject to the provisions of this act, may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as are just and reasonable, and different rates may be charged for the different classes of messages: and *provided further, that nothing in this act shall be construed to prevent telephone, telegraph, and cable companies from entering into contracts with common carriers, for the exchange of services.*" Comp. St. 1913, § 8563.

In support of its contention that the "exchange of service" referred to in this amendment supports the contract in question, reference is made to the court's opinion in the case of Baltimore & Ohio Railroad Company v. Western Union Telegraph Company, 241 Fed. 162, which decision has since been affirmed by the United States Circuit Court of Appeals for the Second Circuit. In view of this authority, I announce my conclusions, which differ from those of the learned courts whose opinions have been referred to, with some hesitancy.

The history of the times, so far as it pertains to the regulation of commerce, is out of harmony with plaintiff's contention. From 1887, when the Interstate Commerce Act was passed, down to the present time, it has been the evident intent and purpose of Congress to require the railroads to render service at reasonable *and uniform* rates. While less appreciated generally, the value of uniformity in the rates charged by a common carrier is as great as the advantage that comes from reasonable rates.

Not only was it the purpose of Congress to secure uniformity of rates in the act to regulate commerce enacted in 1887, but that intent and purpose has been since frequently re-expressed in the various amendments to that act that have been passed by this same body. The Hepburn amendment, enacted in 1906, not only expressed such an intent, but endeavored to avoid evasions of the law. After this amendment became effective, section 6 of the act to regulate commerce, generally known as the Interstate Commerce Act, read as follows:

"No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers

or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs. * * *" Comp. St. 1916, § 8569.

Two decisions by the United States Supreme Court followed shortly thereafter and are particularly enlightening. In the case of Chicago, I. & L. Ry. Co. v. United States, 219 U. S. 486, 31 Sup. Ct. 272, 55 L. Ed. 305, the court said:

"The decisive question in this case is whether the contract between the railway company and the Munsey Company is repugnant to the acts of Congress regulating commerce. In other words, could the company, in return for the transportation which it agreed to furnish and did furnish to the Munsey publisher over its interstate lines, and to his employés and to the immediate members of his and their families, accept as compensation for such service anything else than money, the amount to be determined by its published schedule of rates and charges? Upon the authority of Louisville & Nashville R. R. Co. v. Mottley, 219 U. S. 467 [31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671], just decided, and according to the principles announced in the opinion in that case, the answer to the above question must be in the negative. The acceptance by the railway company of advertising, not of money in the pay-ment of the interstate transportation furnished to the publisher of the Munsey Magazine, his employés and the immediate members of his and their families, was for the reasons given in the Mottley Case, in violation of the Commerce Act. The facts in the present case show how easily, under any other rule, the act can be evaded, and the object of Congress entirely defeated. The legislative department intended that all who obtained transportation on interstate lines should be treated alike in the matter of rates, and that all who availed themselves of the services of the railway company (with certain specified exceptions) should be on a plane of equality. Those ends cannot be met otherwise than by requiring transportation to be paid for in money which has a certain value known to all and not in commodities or services or otherwise than in money."

In the case of Louisville & Nashville Railroad Co. v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671, the court said:

"In our opinion, after the passage of the Commerce Act, the railroad company could not lawfully accept from Mottley and wife any compensation 'different' in kind from that mentioned in its published schedule of rates. And it cannot be doubted that the rates or charges specified in such schedule were payable only in money. They could not be paid in any other way, without producing the utmost confusion and defeating the policy established by the acts regulating commerce. The evident purpose of Congress was to establish uniform rates for transportation, to give all the same opportunity to know what the rates were as well as to have the equal benefit of them. To that end the carrier was required to print, post, and file its schedules and to keep them open to public inspection. No change could be made in the rates embraced by the schedules, except upon notice to the Commission and to the public. But an examination of the schedules would be of no avail, and would not ordinarily be of any practical value, if the published rates could be disregarded in special or particular cases by the acceptance of property of various kinds, and of such value as the parties immediately concerned chose to put upon it, in place of money for the services performed by the carrier. * * * The passenger has no right to buy tickets with services, advertising, releases, or property, nor can the railroad company buy services, advertising, releases, or property with transportation. The statute manifestly means that the purchase

of a transportation ticket by a passenger and its sale by the company shall be consummated only by the former paying cash and by the latter receiving cash of the amount specified in the published tariffs. In the first of the cases last above cited [the Goodridge Case, 149 U. S. 690, 691, 13 Sup. Ct. 970, 37 L. Ed. 986] the court, referring to the practice of allowing rebates, said: 'So opposed is the policy of the act to secret rebates of this description that it requires a printed copy of the classification and schedule of rates to be posted conspicuously in each passenger station for the use of the patrons of the road, that every one may be apprised, not only of what the company will exact of him for a particular service, but what it exacts of every one else for the same service, so that in fixing his own prices he may know precisely with what he has to compete.' * * * "

The foregoing is but a brief account of the history of railroad rate regulation pertinent to the question under consideration, and a brief statement of the law as it stood in 1910, when the amendment to the act to regulate commerce, relied on by the plaintiff, was enacted. The railroads were then without authority to make a contract with a telegraph company, or any one else, whereby as carriers they rendered services at rates different from those charged the general public. This state of the law was the result of successive acts of Congress, each succeeding one going further than its predecessor in eliminating discriminating and preferential rates.

It is claimed by the plaintiff, however, that this act of June 18, 1910, amending the act of February 4, 1887 (Comp. St. 1916, § 8563, subd. 3), gave to the carrier the authority which was denied it by the previous acts of Congress as interpreted by the Interstate Commerce Commission and the Supreme Court of the United States.

Examining the history of this amendment, we find that the purpose and object of the legislation was to include telegraph, telephone, and cable companies, etc., within the provisions of the act to regulate commerce. The amendment of 1910 was not intended to in any way affect the regulation of railroads. It neither added to nor detracted from the power of carriers in respect to rates. The amendment had for its object the bringing within government regulation of quasi public corporations, somewhat similar in their nature and business to common carriers, and was in harmony with public sentiment throughout the nation, voiced by legislation, both state and national. If the carrier did not have the authority to make the contract prior to 1910, it is difficult to see how an act bringing telegraph and telephone companies within the provisions of the law furnished the authority.

But the learned counsel for the plaintiff contends that the amendment was passed by Congress with a full appreciation on its part of the close relation and interdependence of telegraph companies and carriers, and with a full appreciation of the difficulty encountered in charging regular rates for the varied services rendered. Appreciating this situation, it is claimed that the amendment of 1910 expressly ratified the form of contract in existence between most of the telegraph companies and the carriers of the country, which contracts were in all material respects similar to the one here under consideration.

Defendant does not seriously dispute that the effect of this amendment was to ratify the contract so far as "on-line" service was con-

cerned, but denies that it gave validity to these contracts so far as "off-line" service was concerned.

In view of the defendant's contention, it is interesting to examine the reports of the Commission and the decisions of the courts to determine whether there was in fact a distinction between "on-line" service and "off-line" service of a carrier.

This court's attention is called to the Twenty-First Annual Report of the Interstate Commerce Commission, page 25, where the Commission, speaking of the telegraph railroad contracts, said:

"So far as the Commission could see, the full performance of such contracts by the carriers with whom they are made would not affect any public or private interest adversely. Nevertheless the Commission knows of no provisions of law now in force that vests it with authority, or any clause in the law that affords it a reasonable ground, to differentiate "off-line" service of carriers by telegraph companies by transportation of merchandise or any other form of private property for shippers."

In the case of Santa Fé, Prescott & Phœnix Ry. Co. v. Grant Bros. Construction Co., 228 U. S. 177, 33 Sup. Ct. 474, 57 L. E. 787, the following language, used by Mr. Justice Hughes, speaking for the entire court, is instructive:

"It is clear that in dealing with transportation of this character over its own road, in connection with construction or improvement, a railroad company is not acting in the performance of its duty as a common carrier, and the arrangement for free or reduced rate carriage for the necessary materials and men used in the work, when it is a part of the contract, entered into in good faith and not as a subterfuge, is not obnoxious to the provisions of law prohibiting departures from the published tariffs, for the reason that such an agreement lies outside the policy of these provisions. See Matter of Railroad-Telegraph Contracts, 12 Interst. Com. Com'n R. 10, 11."

Still another decision by the Supreme Court, supporting the Interstate Commerce Commission ruling and reversing a decision of the Commerce Court, is that of Interstate Commerce Commission v. Baltimore & Ohio R. R. Co., 225 U. S. 326, 32 Sup. Ct. 742, 56 L. Ed. 1107, Ann. Cas. 1914A, 504. The question in that case was whether the railroad company could charge a different rate for transportation of coal to a given point to a railroad than to other shippers; the coal being intended for use by the railroad as fuel. The court held that the rate charged must be the same as the rate charged other persons for the same service. In that case the court said:

"The circumstances and conditions which may so far be considered as distinguishing traffic so as to take from different transportation charges the vice of preference, have been described by this court. In Wight v. United States, 167 U. S. 512, 518 [17 Sup. Ct. 822, 42 L. Ed. 258], it is said: 'It was the purpose of the section (2) to enforce equality between shippers, and it prohibits any rebate or any device by which two shippers shipping over the same line, the same distance, under the same circumstances of carriage, are compelled to pay different prices therefor.'"

Again the court said:

"It is admitted that the fact that the railroad is the shipper or consumer is not a circumstance or condition that affects the carriage, nor can the different uses to which the coal may be put, and it would seem necessarily that any other extraneous condition or circumstance could have no greater potency. Once depart from the clear directness of what relates to the carriage only,

and we may let in considerations which may become a cover for preferences. * * * It must be kept in mind that it is not the relation of one railroad to another with which we may have any concern, but the relation of the railroad to its patrons, who are entitled to equality of charges."

The amendment of 1910 made the telegraph and telephone companies common carriers within the meaning and purpose of the act to regulate commerce. The amendment did not in any way modify section 6 of the act to regulate commerce, as amended by the act of June 29, 1906, which expressly provided:

"Nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time."

The difficulty experienced in determining the value of its service, and the inability of the carrier to classify such service as it renders the telegraph company, referred to by the plaintiff's attorney, applies to "on-line" service only. No difficulty should be experienced by the carrier in charging the telegraph company its regular rates for transporting material over its line to be delivered to a connecting carrier for further conveyance. In this respect it acts as a common carrier, and in reason and justice should comply with that cardinal rule of railroad rate regulation, namely, that all rates shall be uniform and the same to all patrons.

The plaintiff's counsel, with much zeal and commendable industry, has collected a large number of definitions of the word "exchange"; while defendant's counsel has also furnished the court with a number of definitions of that word. While not unmindful of the value of lexicons in a case like the present, the court is satisfied that the correct construction to be placed upon the term "exchange of service" cannot be gathered from dictionaries alone.

If this court were to adopt the construction given by the plaintiff's attorney, it would impute to Congress a reversal of its settled policy, and give validity to a contract which at common law was contrary to public policy. Congress, in passing this amendment, acted in the light of judicial construction of similar legislation, and was aided by the conference rulings of the body delegated by it to enforce the law it was about to enact. In the face of the history of railroad legislation, this court is not justified in construing a phrase so as to permit a common carrier, acting as such to render service to one patron at rates different from those charged other patrons, when a different construction is reasonably open.

Under all the circumstances, the court concludes that the "exchange of service" referred to in the amendment of 1910 validated the contract so far as it pertained to "on-line" service, but such act did not validate the contract so far as it provided for compensation other than regular rates when either company rendered the other "off-line" service.

[2] The fact that the contract may have been valid when executed will not overcome the effect of the amendment of 1906, which clearly prohibited such contracts as are here sought to be enforced. New

York Central & Hudson River Railroad Co. v. Gray, 239 U. S. 583, 36 Sup. Ct. 176, 60 L. Ed. 451; C., I. & L. Railway Co. v. United States, supra.

[3] In reaching this conclusion, no consideration has been given the conference rulings of the Interstate Commerce Commission made since the enactment of the amendment of 1910. These rulings, while not conclusive (Atchison, Topeka & Santa Fé Ry. Co. v. United States, 244 U. S. 336, 37 Sup. Ct. 635, 61 L. Ed. 1175, decided June 4, 1917), are entitled to great weight, and should not be lightly overruled.

On June 8, 1912, the Commission approved its conference ruling No. 364, which is as follows:

"*Exchange of Services by Telegraph and Railroad Companies.*—Under the amendatory act of June 18, 1910, it is provided 'that nothing in this act shall be construed to prevent telephone, telegraph, and cable companies from entering into contracts with common carriers for the exchange of services.' Upon inquiry, held, that a railroad company and a telegraph company may exchange services with respect to strictly company matters on the basis of their agreement."

On July 15, 1914, the Commission approved the following conference ruling:

"Upon inquiry as to whether or not, under the provision of section 1 'that nothing in this act shall be construed to prevent telephone, telegraph, and cable companies from entering into contracts with common carriers, for the exchange of services,' a railroad may contract with a telegraph company (including in that term 'telephone, telegraph, and cable companies') to transport the property of such telegraph company, whether for use on the line of said railroad or merely to be transported over such line for use elsewhere, at a different rate from that applicable to such transportation under section 6 of the act, held, that while said carriers may contract for an exchange of services, such services must be exchanged upon the basis of the lawful rates of said railroad, as published and filed in accordance with the provisions of section 6 of the act, and of the reasonable charges of said telegraph company regularly charged other customers for similar services; except that said carriers may contract, without reference to said lawful rates and charges, for the transportation by said railroad for said telegraph company of the property of the latter over the line of the former when such property is to be used along the line of said railroad and in the construction, improvement, or operation of said railroad—that is to say, when such transportation is not conducted by said railroad as a common carrier."

This ruling was reaffirmed on March 26, 1916.

Surely the conclusions of the body delegated by Congress to enforce the statute are entitled to great weight in a case like the present. The rulings of administrative bodies charged with the enforcement of certain statutes have very generally been given careful consideration and credit by the courts. Pennell v. Philadelphia & Reading Ry. Co., 231 U. S. 675, 34 Sup. Ct. 220, 58 L. Ed. 430; United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007.

The contract in the present case was modified some years after it was made; but the rights of the parties, so far as this case is concerned, were not changed in any respect by the modification. The contract, so far as it provides for compensation for "off-line" service at rates other than those charged the general public, is invalid.

Plaintiff's bill must be dismissed. Let a decree be so entered.